**Fred Dean MANNING, Petitioner-Appellant,**

v.

**Gale JARNIGAN, Sheriff, Respondent-Appellee.**

No. 73–1463.

United States Court of Appeals, Sixth Circuit.

Argued Nov. 28, 1973.

Decided July 30, 1974.

---

R. Price Nimmo, Nashville, Tenn., for petitioner-appellant; Dale M. Quillen, Nashville, Tenn. (court appointed), on brief.

Alex B. Shipley, Jr., Asst. Atty. Gen., for respondent-appellee; David M. Pack, Atty Gen. of Nashville, Tenn., of counsel.

Before EDWARDS, CELEBREZZE and McCREE, Circuit Judges.

EDWARDS, Circuit Judge.

This is an appeal from the denial without an evidentiary hearing of a petition for writ of habeas corpus. We reverse and remand for such a hearing.

Appellant had been convicted by a jury in a Tennessee state court on two charges of unlawful sale of legend drugs (barbituates) and one charge of unlawful possession of such drugs without a prescription, in violation of Tenn.Code Ann. §§ 52–1204 and 52–1206 (1966). On each count he received a sentence of five years imprisonment, with the three sentences to be served consecutively. His convictions were reversed by the Court of Criminal Appeals of Tennessee, the conviction for unlawful possession was dismissed, and two convictions of unlawful sale were remanded for a new trial. The Tennessee Supreme Court, however, reversed the Court of Criminal Appeals and reinstated the convictions. State v. Manning, Tenn., 490 S.W.2d 512 (1973).

The facts disclosed by the record of the state court trial include the follow-

ing. Appellant was stopped by police while driving about 20 miles per hour in a 30 mile per hour zone about 4 a. m. in Morristown, Tennessee. The officer who arrested him called another squad car to the scene and then stopped appellant by flashing a spotlight on his car. The officer admitted that appellant was not violating any traffic law and that he had no reason to believe he had committed any crime. The officer testified at the state court trial that he stopped appellant because the chief of police had issued an order "to check out all cars late at night." He testified that he thought this car was suspicious because it was out late and driving slowly.

Upon stopping appellant's car, the first police officer on the scene testified that he recognized the driver as appellant whom he knew as a bootlegger. The officer testified that he then asked if they could search his car and that appellant said that they could and opened the trunk. Appellant testified that the officer told him to open his trunk and that he did. Two officers then searched the trunk and the car. They seized some books described as "sex books" and some women's bikini pants from the trunk, and some pills and a pengun from the car.

Appellant contends that the search of the automobile was illegal and that the evidence seized should not have been admitted at the trial. The government asserts that appellant consented to the search. The first basis for appellant's objection is that the stopping of appellant was unlawful because it was not based on probable cause.

■ Of course, "a police officer may in appropriate circumstances and in an appropriate manner approach a person for purposes of investigating possibly criminal behavior even though there is no probable cause to make an arrest." Terry v. Ohio, 392 U.S. 1, 22, 88 S.Ct.

1868, 1880, 20 L.Ed.2d 889 (1968). However, the circumstances in the case before us are different from those in *Terry*.[1] This record offers no other explanation for the stop than the testimony of one of the officers that "we like to check them out to see who they are."

The difference between an investigatory stop and an arrest has yet to be spelled out. *See generally* Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L. Ed.2d 889 (1968), and Adams v. Williams, 407 U.S. 143, 92 S.Ct. 1921, 32 L. Ed.2d 612 (1972). The Supreme Court of the United States has said this about the question as to when an arrest occurs:

"When the officers interrupted the two men and restricted their liberty of movement, the arrest, for purposes of this case, was complete. It is, therefore, necessary to determine whether at or before that time they had reasonable cause to believe that a crime had been committed. The fact that afterwards contraband was discovered is not enough. An arrest is not justified by what the subsequent search discloses, as Johnson v. United States [333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436], supra, holds." Henry v. United States, 361 U.S. 98, 103, 80 S.Ct. 168, 171, 4 L.Ed.2d 134 (1959).

This court has held:

"It appears to this court that the arrest was actually made by Officer Miller when he detained Baxter for the several minutes before Reimer's arrival. The government concedes that this was an arrest. Further, this was clearly a deprivation of liberty under the authority of law. It does not take formal words of arrest or booking at a police station to complete an arrest. Henry v. United States, 361 U.S. 98, 80 S.Ct. 168, 4 L.Ed.2d 134 (1959); Long v. Ansell, 63 U.S. App.D.C. 68, 69 F.2d 386 (1934), aff'd,

---

1. This case is also clearly distinguishable from two recent cases, United States v. Robinson, 414 U.S. 218, 94 S.Ct. 467, 38 L. Ed.2d 427 (1973), and Gustafson v. Florida,

414 U.S. 260, 94 S.Ct. 488, 38 L.Ed.2d 456 (1973). In both of those cases the officers involved clearly had probable cause for arrest.

293 U.S. 76, 55 S.Ct. 21, 79 L.Ed. 208 (1934); Coleman v. United States, 111 U.S.App.D.C. 210, 295 F.2d 555 (1961) cert. denied, 369 U.S. 813, 82 S.Ct. 689, 7 L.Ed.2d 613 (1962); cf. (dictum), United States v. Vita, 294 F.2d 524, 529–530 (C.A. 2, 1961), cert. denied, 369 U.S. 823, 82 S.Ct. 837, 7 L.Ed.2d 788 (1962)." United States v. Baxter, 361 F.2d 116, 118–119 (6th Cir.), cert. denied, 385 U.S. 834, 87 S.Ct. 79, 17 L.Ed.2d 69 (1966).

*See also* Young v. United States, 140 U.S.App.D.C. 333, 435 F.2d 405 (1970); Bailey v. United States, 128 U.S.App.D.C. 354, 389 F.2d 305 (1967); Brown v. United States, 125 U.S.App.D.C. 43, 365 F.2d 976 (1966).

Our view on this score is strengthened by the recent opinion of the United States Supreme Court in Almeida-Sanchez v. United States, 413 U.S. 266, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973). In holding a stop and search of a car within 25 miles of the Mexican border to be invalid without a search warrant, the Court said:

"No claim is made, nor could one be, that the search of the petitioner's car was constitutional under any previous decision of this Court involving the search of an automobile. It is settled, of course, that a stop and search of a moving automobile can be made without a warrant. That narrow exception to the warrant requirement was first established in Carroll v. United States, 267 U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543. The Court in *Carroll* approved a portion of the Volstead Act providing for warrantless searches of automobiles when there was probable cause to believe they contained illegal alcoholic beverages. The Court recognized that a moving automobile on the open road presents a situation 'where it is not practicable to secure a warrant because the vehicle can be quickly moved out of the locality or jurisdiction in which the warrant must be sought.' 267 U.S., at 153, 45 S.Ct. at 285. *Carroll* has been

followed in a line of subsequent cases,[1] but the *Carroll* doctrine does

1. *E. g.,* Chambers v. Maroney, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419; Dyke v. Taylor Implement Mfg. Co., 391 U.S. 216, 88 S.Ct. 1472, 20 L.Ed.2d 538; Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879; Husty v. United States, 282 U.S. 694, 51 S.Ct. 240, 75 L.Ed. 629.

not declare a field day for the police in searching automobiles. Automobile or no automobile, there must be probable cause for the search.[2]

2. Moreover, "[n]either *Carroll, supra,* nor other cases in this Court require or suggest that in every conceivable circumstance the search of an auto even with probable cause may be made without the extra protection for privacy that a warrant affords." Chambers v. Maroney, [*supra*], [399 U.S.], at 50, [90 S.Ct., at 1981.] See also Coolidge v. New Hampshire, 403 U.S. 443, 458–464, 91 S.Ct. 2022, 2033–2037, 29 L.Ed.2d 564]. Almeida-Sanchez v. United States, 413 U.S. 266, 269, 93 S.Ct. 2535, 2538, 37 L.Ed.2d 596 (1973).

We recognize that *Almeida-Sanchez* is not precisely in point since in that case there was neither probable cause for the arrest nor even (as here) arguable consent to the search. (*Cf.* Schneckloth v. Bustamonte, 412 U.S. 218, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973), where both probable cause for the stop (arrest) and voluntary consent to the search were found.)

We believe, however, in view of the deterrent purposes of the exclusionary rule (*see* United States v. Calandra, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), any illegal arrest must require suppression of the evidence subsequently seized as a result under the rationale of Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963). *See also* Johnson v. United States, 333 U.S. 10, 68 S.Ct. 367, 92 L.Ed. 436 (1948).

Also applicable to our instant case is a recent case from the Ninth Circuit. In United States v. Mallides, 473 F.2d 859 (9th Cir. 1973), there was testimony that after a stop held by the court to be

completely without probable cause, Mallides gave permission to examine the trunk which resulted in damaging evidence which was admitted at trial. The Court of Appeals reversed for dismissal of the indictment, holding:

"Neither the Supreme Court nor this court has ever upheld the legality of a detention based upon an officer's unsupported intuition, and we refuse to do so now.

"The stop and detention were illegal, and the fruit of the illegal conduct was inadmissible." United States v. Mallides, 473 F.2d 859, 862 (9th Cir. 1973). (Footnotes omitted.)

■ The critical question in our instant case appears to be when the arrest occurred. More precisely, was the appellant free to leave (at any time prior to the search) after the police officer flashed his spotlight on appellant's car? The only trial record is that in the state court which did not focus on this question at all. Since the question is essentially an unresolved question of fact, we believe an evidentiary hearing and findings of fact are required.

If the first question is answered favorably to the prosecution, the second question to be answered after evidentiary hearing is: Based on the totality of the circumstances, was the consent to search appellant's car freely and voluntarily given under the standards set for this in Schneckloth v. Bustamonte, 412 U.S. 218, 228–229, 93 S.Ct. 2041, 36 L. Ed.2d 854 (1973)? Appellant had been stopped late at night; there were three armed officers on the scene; appellant had only a third-grade education and had been in a state hospital for the insane on six occasions; and appellant was never advised that he had the right to refuse to consent to the search. On cross-examination, however, he said that he knew he did not have to agree to the search, although the record does not make clear whether he knew this at trial or the time of the search.

Testimonial exploration of these facts will be required to answer the "consent" questions stated or implied above.

The search and seizure issues in this case, of course, pertain only to appellant's conviction on the count alleging possession of legend drugs. He also attacks his convictions on all counts, including two counts of sale of legend drugs, claiming due process violations in his state court trial.

In this regard appellant asserts that the conduct of the prosecuting attorney during trial was both improper and so prejudicial as to violate his federal constitutional right to a fair trial.

Three of the incidents relied on involve prosecutorial reference to appellant's alleged prior involvement in criminal acts concerning bootlegging and other incidents of possession of legend drugs not charged in the indictment, and not probative of either scheme or intent.

Even more disturbing, there is evidence in this record that the prosecutor subsequently boasted in effect that he knew that his questions were objectionable, but that, even if they were stricken, the jury would not forget.

Finally, it is asserted that the prosecuting attorney made a prejudicial statement before the jury when he realized that he would not be able to make a closing argument, because appellant's counsel had waived closing argument. The following exchange occurred between defendant's counsel and the prosecuting attorney:

MR. QUILLEN: May it please the Court, we would like to be informed just what the remark was—if the Attorney General did make one awhile ago in the presence of the Jury. Was there a comment made?

MR. WINSTEAD: Yes, I threw my notes back down on the table and I said that maybe I'd get to use that argument next year. I hope not against this defendant.

MR. QUILLEN: I think that was improper and I further renew my motion for mistrial.

MR. WINSTEAD: I think you've thought just about everything was improper, Mr. Quillen.

With regard to the prosecuting attorney's conduct, we call attention to prosecutorial duty as described by the Supreme Court:

"[The prosecutor] is the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done. As such, he is in a peculiar and very definite sense the servant of the law, the two-fold aim of which is that guilt shall not escape or innocence suffer. He may prosecute with earnestness and vigor—indeed, he should do so. But, while he may strike hard blows, he is not at liberty to strike foul ones. It is as much his duty to refrain from improper methods calculated to produce a wrongful conviction as it is to use every legitimate means to bring about a just one.

"It is fair to say that the average jury, in a greater or less degree, has confidence that these obligations, which so plainly rest upon the prosecuting attorney, will be faithfully observed. Consequently, improper suggestions, insinuations and, especially, assertions of personal knowledge are apt to carry much weight against the accused when they should properly carry none." Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935).

■ *Berger*, of course, was a federal case wherein the Supreme Court's superintending control afforded stricter supervision than is available to us in a federal habeas corpus proceeding attacking a state court conviction. But the facts we have referred to are disturbing enough to remand these issues also for an evidentiary hearing and findings of fact on appellant's claims of federal due process violation. In this regard the District Judge will, of course, have to determine the issue in accordance with the recent opinion of the Supreme Court in Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 40 L.Ed.2d 431 (1974), and decide whether "this incident made respondent's trial so fundamentally unfair as to deny him due process." *Id.* at 645, 94 S.Ct. at 1872.

The judgment of the District Court is reversed and the case is remanded for hearing in accordance with this opinion.

CELEBREZZE, Circuit Judge (concurring in part, dissenting in part).

I agree with the majority that the police order to stop all cars out after midnight if, as the testimony indicated, "we think they're suspicious out late like that," was an arbitrary order and that the stopping of Appellant's car was illegal under the rationale of Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). However, I disagree that it is necessary to remand the case to the District Court for the purpose of taking evidence as to when, or whether, an arrest occurred prior to the search of Appellant's automobile. I would apply the "totality of circumstances test" enunciated by the Supreme Court in Schenckloth v. Bustamonte, 412 U.S. 218, 93 S. Ct. 2041, 36 L.Ed.2d 854 (1973), to determine whether Appellant voluntarily consented to the search of his automobile. United States v. Watson, 504 F.2d 849 (9th Cir. Mar. 20, 1974); United States v. Rothman, 492 F.2d 1260 (9th Cir., 1973). In Wong Sun v. United States, 371 U.S. 471, 83 S.Ct. 407, 9 L. Ed.2d 441 (1963), the Supreme Court held inadmissible statements claimed to have been freely given following an unlawful entry by six or seven officers into the defendant's bedroom. The Court found that

"[u]nder such circumstances it is unreasonable to infer that Toy's response was sufficiently an act of free will to purge the primary taint of the unlawful invasion." 371 U.S. at 486, 83 S.Ct. at 417.

This suggests that circumstances could exist under which a voluntary consent

could negate an unlawful entry. In balancing the circumstances involved in this case—armed officers physically larger than Appellant; the low degree of Appellant's education and his previous confinements in a state hospital for the insane; the absence of any advice that Appellant had the right to refuse consent to the search; and Appellant's testimony on the matter—I would find that Appellant had voluntarily consented to the search. At the hearing in the District Court, Appellant, on cross-examination, testified in the following manner:

Q Mr. Manning, you're familiar enough with the law to know that you have the right not to let the man search your car without a search warrant? Right?

A Well, if I want to, I can.

Q You agreed to let him search the car? You knew you didn't have to let him search your car?

A Yes, sir.

The testimony does not reflect the use of any "inherently coercive tactics—either from the nature of the police questioning or the environment in which it took place." Schneckloth v. Bustamonte, 412 U.S. at 247, 93 S.Ct. at 2058. Appellant, although he testified on this matter, gave no intimation that he felt he was under duress or was being coerced to cooperate. His statement that he knew he could refuse consent diminishes the significance of his lack of education and his previous hospitalization. I would agree that "arrest is but one factor, albeit a critical one, in determining whether or not the consent was voluntary." United States v. Rothman, 492 F.2d 1260, 1264 n. 1 (9th Cir., 1973). However, Appellant's concession seems to me to be clear. Thus, I would arrive at the same conclusion whether the facts constitute an unlawful arrest or an unlawful *Terry*-type investigative stop.

I also do not agree that a remand is necessary for any findings of fact relating to prosecutorial comments. The record demonstrates that the conduct of the prosecuting attorney during the trial was improper and prejudicial. On three occasions, reference was made to Appellant's prior involvement in criminal acts not charged in the indictment. On one occasion, the prosecuting attorney asked Appellant:

"Well, now you examine this one right here and this one here, aren't those both speckled birds? That's what they're known at in your trade, isn't it, Mr. Manning, speckled birds?"

The Court sustained an objection to the phrase "in your trade," but the jury was never instructed to disregard the statement. The second objection arose during the questioning of Appellant's mother by the prosecutor:

Q Mrs. Shiflet, Dean Manning has been able to bootleg most of his life, hasn't he?

MR. QUILLEN: I'm going to object to that, if the Court please. I move for a mistrial because of it.

THE COURT: He may ask her what his occupation is. He can rephrase it.

Two other incidents occurred when Appellant was recalled to the witness stand:

Q You were there and you got 50 pills.

A I did not pay for no pills.

Q You didn't pay for them, you got them though. You went up there to get them on a forged prescription from Dr. Lynch.

MR. QUILLEN: Your Honor, I object—

THE COURT: Sustained as to the forged. He may inquire of him if he got the pills at the drug store in Bulls Gap.

Q I'll ask you Mr. Manning, if on Saturday, May 16th, 1970, at 4:30 p. m., if you did not appear in Steinson's Drug Store in Bulls Gap, Hawkins County, Tennessee, and ask for 55 Oberdren capsules on a prescription from Dr. Lynch?

A   I went in there but I didn't ask for no 50 pills.

Q   You received a bag?

A   No, sir, I did not have it in my hand.

Q   You didn't have it in your hand? Dr. Stinson had it in his hand?

A   Yes.

Q   And that's when you were arrested?

MR. QUILLEN: I object, if the Court please and move that it be stricken from the record.

THE COURT: Sustained as to the arrest.

Again, the jury was not instructed to disregard the statement by the prosecutor.

Coupled with this line of questioning was the prosecutor's closing statement, quoted by the majority. In addition to these statements by the prosecutor, Appellant contends that the Court improperly permitted testimony about items found in Appellant's car but not material to the case. These items were the "sex books" and bikini pants found in Appellant's trunk and a pen gun found in the console of the car. The court overruled Appellant's objections and, regarding the books and the pants, stated: "It's for the jury to say whether they have a bearing on this particular case."

Regarding the cross-examination of Appellant, we have previously stated:

"It is clear that ordinarily on cross-examination a defendant may not be questioned as to whether he participated in unrelated specific acts of criminal conduct not resulting in a conviction, as such evidence has no relevancy to the issue of defendant's guilt or innocence of the crime charged, and such evidence is likely to be extremely prejudicial." United States v. Rudolph, 403 F.2d 805, 806 (6th Cir. 1968)

While the Court sustained Appellant's objection, no instruction was given to the jury to disregard the questions. In *Rudolph, supra,* we reversed the conviction even though the jury had been given such an instruction:

"[w]e are of the opinion that the cautionary instruction did not remove the prejudice. It must be remembered that after the saber thrust, the withdrawal of the saber still leaves the wound." 403 F.2d at 807

In the case before us, we have merely the court's sustaining of the objection. I would find that insufficient to cure the prejudice to Appellant. Similarly, the question asked Appellant's mother was also highly prejudicial. The reference to bootlegging had no bearing whatsoever on the charge against Appellant for possession of drugs. Upon Appellant's objection, the Court merely required that the question be rephrased. This repeated reference to criminal acts not the subject of the trial was highly improper and a failure to give any cautionary instruction increased the possibility of prejudice.

In *Rudolph, supra,* even the cautionary instruction was not sufficient:

"The Government contends that the error was cured by the court's instruction to the jury to disregard the question. While ordinarily the trial court has discretion to determine whether a cautionary instruction is sufficient to avoid granting a mistrial, we think that the question asked in this case was so clearly improper and prejudicial to the defendants that the harm could not be erased by any instruction which the court might give." 403 F. 2d at 806.

With regard to the statement by the prosecuting attorney at the close of the case, I find it to be a flagrant disregard for the high duty owed in prosecuting a case. The conduct of the prosecutor certainly does not comport with that duty as described by the Supreme Court in Berger v. United States, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). It is apparent to me that this conduct of the prosecutor was designed to improperly influence the jury. "That it was intended to prejudice the jury is suffi-

cient ground for a conclusion that in fact it did so." Pierce v. United States, 86 F.2d 949, 953 (6th Cir. 1936). I find my conclusion substantiated by an out-of-court statement made by the prosecutor and overheard by defense counsel and related to the Court:

I have a further thing, too, I'd like to bring attention to before the Court before we go any further. A new motion for a mistrial for the reason, Dean Manning, from the indictment of this trial, has been denied a fair trial by the District Attorney General's comments and that General Winstead, with his experience, well knew the things that he was doing were wrong. I was having lunch, and he's here hearing what I have to say, he may correct me if I'm wrong, I was having lunch within earshot of his table at which time he was talking with some people, including his witness, Nash, and some others and he commented on how he had asked a question about this defendant buying some pills either at Bulls Gap or Rogersville and said the defense could object all they wanted to then, the Jury had already heard it. I present this as highly improper and for that reason, the Attorney General knew it was unfair, denying this defendant a fair trial and I renew my motion for mistrial.

THE COURT: Were any of the Jurors present when he made that statement?

MR. QUILLEN: No jurors present that I knew of.

MR. WINSTEAD: I try my lawsuits in Court. I don't want any trouble.

THE COURT: Gentlemen, I believe in freedom of speech, wherever people go.

MR. QUILLEN: What I'm getting at is, the Attorney General asked an improper question, knowing that it was improper, caring less how much we objected to it, he knew the dam-

age had been done when the Jury heard the questions.

THE COURT: Gentlemen, when you raised a proper objection, the Court sustained your objection. The record will disclose that at different times, there were no objections in certain of the testimony. And the Court will properly instruct the Jury when an objection is made to this Court.

Regarding similar conduct by a prosecutor, we have previously said:

"To those with any breadth of experience in the trial of criminal cases it must be clear that suggestions, especially when often repeated, that a defendant has earlier been in trouble with the law, that he has elsewhere or previously been indicted, that he has been frequently detained and investigated by law enforcement officers, and that he is a fugitive from justice, are so prejudicial that no admonition from the court that they be disregarded, however promptly and forcibly made, may be safely relied upon to free the minds of jurors from the impression that the defendant is of bad character and capable of committing the crime charged. They may completely overthrow the presumption of innocence.

\*    \*    \*    \*    \*    \*

It is quite true that the court ruled correctly upon all objections interposed by the defendants, but in most instances the ruling came after the mischief had been done, and it was clearly a case where the misconduct of the prosecutors was neither slight nor confined to a single instance, but so pronounced and persistent that the cumulative effect upon the jury cannot be disregarded as inconsequential. Berger v. United States, 295 U.S. 78, [85], 55 S.Ct. 629, 632, 79 L.Ed. 1314. As was said in that case: "The trial judge, it is true, sustained objections to some of the questions, insinuations and misstatements, and instructed the jury to disregard them. But the situ-

ation was one which called for stern rebuke and repressive measures and, perhaps, if these were not successful, for the granting of a mistrial. It is impossible to say that the evil influence upon the jury of these acts of misconduct was removed by such mild judicial action as was taken." Pierce v. United States, 86 F.2d 949, 952–953 (6th Cir. 1936).

Since the jury was given no instructions to disregard the improper comments, there can be little doubt that they had a prejudicial effect.

I would also find that the testimony referring to the "sex books" and bikini pants and the pen gun found in Appellant's car was not relevant to the case and was prejudicial to Appellant. Relevant evidence "is evidence that in some degree advances the inquiry, and thus has probative value," C. McCormick, Law of Evidence 319 (1954). Its purpose is "to prove or disprove some issue in the cause on trial. If proffered evidence does not tend to do either of these things, it has no place in the trial and is either immaterial or collateral to the inquiry." Herzog v. United States, 226 F.2d 561, 565 (9th Cir. 1955). The general rule is that the relevancy or materiality of evidence is a matter to be decided in the discretion of the trial judge. Wilson v. United States, 250 F.2d 312, 325 (9th Cir. 1958). However, as the "sex books," bikini pants and pen gun had no value in proving any issue before the court, and the chance was great that its admission would be prejudicial, I would find that the court abused its discretion in admitting the evidence. *See* United States v. Johnson, 254 F.2d 175, 176 (2d Cir. 1958).

Thus, I would hold that the reference to prior criminal acts and the admission of prejudicial immaterial evidence "so infected the trial with unfairness as to make the resulting conviction a denial of due process." Donnelly v. DeChristoforo, 416 U.S. 637, 94 S.Ct. 1868, 1871, 40 L.Ed.2d 431 (1974). I would reverse the judgment of the District Court and remand the case with direction that the District Court grant the writ of habeas corpus to Appellant unless the State of Tennessee grants him a new trial within a reasonable time to be fixed by the District Court.