UNITED STATES of America, Plaintiff,

v.

Arnold MILES, Defendant.

Crim. No. 5–81316.

United States District Court,
E. D. Michigan, S. D.

Jan. 19, 1977.

Richard A. Rossman, Pleasant Ridge, Mich., for defendant.

## MEMORANDUM OPINION AND ORDER GRANTING MOTION TO SUPPRESS

KEITH, Chief Judge.

This matter is before the Court on defendant Arnold Miles' Motion to Suppress Evidence filed pursuant to Rule 41(f) of the Federal Rules of Criminal Procedure. The defendant has been charged in a one count indictment with possession with intent to distribute approximately 292.77 grams of heroin in violation of Title 21 U.S.C. § 841(a)(1). An evidentiary hearing was held to establish the relevant facts.

On August 4, 1975, at approximately 2:30 p. m., Special Agent Paul J. Markonni received an anonymous telephone call at the Drug Enforcement Administration Task Force Metropolitan Airport Detail Office. The caller indicated that a person named Miles would be returning to Detroit from Los Angeles, California with a "load of heroin." The caller described Miles as about 25 years of age, six feet tall, slim, with straightened hair and a beard.[1] According to Agent Markonni's testimony the caller refused to give any further information about himself or about his source of information.

At approximately 4:30 p. m. on the same date Agent Markonni, Agent Seward and Agent Dykstra, two other Drug Enforcement Administration agents, were routinely watching the arrival of American Airlines Flight 68 from Los Angeles when they noticed an individual, later identified as the defendant, deplane. Agent Markonni and Agent Seward testified that no other deplaning passenger matched the description given by the anonymous caller.

Agent Markonni further testified that after he and the other agents watched Mr. Miles deplane they followed him to the baggage area where he made a telephone call

Robert D. Sharp, Asst. U. S. Atty., Detroit, Mich., for plaintiff.

---

1. This is the description testified to by Agent Markonni. Agent Seward testified that Agent Markonni related the description to him as a black male in his 20's, six feet one inch tall and weighing 180 pounds. Agent Dykstra stated he could not recall the description. He could only recall that they were looking for "a black male subject."

and claimed a suitcase. Immediately after Mr. Miles left the terminal he was approached by the three agents. Agent Markonni identified himself and requested identification from Mr. Miles. After Mr. Miles had produced the identification, Agent Markonni asked him to accompany the agents to a private office so that they could "get out of public view." [2] Mr. Miles was then taken to the American Airlines baggage storage room by the agents, at least two of whom accompanied him inside the office.

Once inside the office Agent Markonni testified that he advised Mr. Miles of his "*Miranda*" rights [3] and informed him that there was reason to believe that Miles was in possession of a quantity of narcotics. Agent Markonni told Mr. Miles that he wanted to look into the suitcase Miles was carrying and that Miles could either give his permission or require the agents to obtain a search warrant. [4] According to the testimony of Agent Markonni, Mr. Miles said it would not be necessary for the agents to obtain a search warrant. Mr. Miles then took the key to the suitcase from his trouser pocket, bent down to the suitcase which was now on the floor between Agent Markonni and Mr. Miles, unlocked the suitcase, opened it partially and began rummaging around inside. [5]

A few seconds later the defendant pulled out a brown paper bag and said something to the effect of: "This is what you're looking for." The defendant then closed the suitcase, stood up, and handed the bag to Agent Markonni. The brown paper bag contained what Agent Markonni believed to be approximately one pound of marijuana. At this point Agent Markonni informed Mr.

Miles that he was under arrest for violation of the Federal Controlled Substance Act. Agent Markonni, believing that he had seen another brown paper bag in the suitcase, proceeded to search the suitcase himself and found a quantity of what he suspected to be brown heroin and a large quantity of currency. These were seized by the agents. Mr. Miles was then handcuffed and taken to the Drug Enforcement Administration office at the airport and processed.

■ Searches conducted without a warrant are *per se* unreasonable under the fourth amendment, except in "a few specifically established and well-delineated exceptions." *Katz v. United States,* 389 U.S. 347, 357, 88 S.Ct. 507, 514, 19 L.Ed.2d 576 (1967). The Court must therefore determine whether the search conducted here falls within one of those exceptions.

It is the contention of the government that the search of Mr. Miles' bag was conducted with his consent. As a result, the government argues, Mr. Miles waived his fourth amendment rights and no warrant was necessary.

The defendant conversely argues that any consent he might have given was not given freely and voluntarily. Moreover, defendant contends that at the time of the search he was under arrest. It is argued that probable cause for an arrest was lacking, therefore, under the principles announced in *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), any evidence found during a search after that arrest should be suppressed because it is tainted by the illegality of the arrest.

■ The initial questions before the Court are whether defendant was under

2. According to the testimony of the three agents there was no further conversation until Mr. Miles was inside the baggage room. Mr. Miles, however, testified that he declined to accompany the agents and when he began to walk off, one agent took him by the arm and again repeated the request that Mr. Miles accompany them.

3. Mr. Miles denied that he was advised of his rights at this juncture. According to his testimony, he was told of his rights only when he was being led from the baggage room.

4. Mr. Miles denied that this statement was ever made to him.

5. It is the testimony of Mr. Miles that he opened the suitcase because he was away from the public view and there were three armed officers in the room and he did not want "to be no accident."

arrest at any time prior to being informed of his arrest in the baggage room by Agent Markonni, and if so, whether there was probable cause to make such an arrest.

Probable cause exists where "the facts and circumstances within their [the officers'] knowledge and of which they had reasonably trustworthy information [are] sufficient in themselves to warrant a man of reasonable caution in the belief that" an offense has been or is being committed. Probable cause means "more than bare suspicion." It means "a reasonable ground for belief of guilt." (Citations omitted). *United States v. Lewis,* 504 F.2d 92, 100–01 (6th Cir. 1974).

■ Probable cause may be based upon hearsay information obtained from an informant. In *Aguilar v. Texas,* 378 U.S. 108, 114, 84 S.Ct. 1509, 12 L.Ed.2d 723 (1964), the Supreme Court established a two-pronged test for assessing the probative value of an informant's information: there must be some information regarding the underlying circumstances from which the informant concluded that things are as he represents them to be; and there must be some basis for believing that the informant himself was credible or his information reliable.

■ In this case Agent Markonni had only the word of an anonymous caller that a man named Miles would arrive at the airport carrying a "load of heroin". The basis for the informant's information was not given nor was there any basis for Agent Markonni to believe that the informant was a reliable one. Neither of the requirements of the *Aguilar* test was met.

Although the tip alone failed to provide probable cause, probable cause may have been established by the tip in addition to information gathered by the agents in question via an independent investigation which substantially verified the information given by the informant. *Draper v. United States,* 358 U.S. 307, 79 S.Ct. 329, 3 L.Ed.2d 327 (1959). See *Whiteley v. Warden,* 401 U.S. 560, 567, 91 S.Ct. 1031, 28 L.Ed.2d 306 (1971).

At the time Miles was initially questioned, the independent investigation conducted by the agents revealed the following: (1) a man resembling the description given by the anonymous caller deplaned from American Airlines Flight 68 from Los Angeles, California; (2) this man made a telephone call from the baggage area; (3) this man picked up a suitcase from the baggage claim area; (4) this man proceeded to leave the airlines terminal; (5) this man showed identification bearing the name Arnold E. Miles.

■ Nothing the officers had observed to this point was inconsistent with completely innocent behavior. There was nothing to suggest that the defendant was engaged in any criminal conduct. It is the opinion of this Court that the informer's tip standing alone did not create probable cause nor did it add a suspicious color to the independent observations of the officers. See *Spinelli v. United States,* 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969). Since neither the tip standing alone nor when combined with the independent investigation of the officers provided a basis for anything more than mere suspicion, the Court must conclude that at the time the agents asked Mr. Miles to accompany them to the baggage room there was no probable cause for defendant's arrest.

The next question to be resolved is whether defendant was actually placed under arrest at any time prior to the time when he handed Agent Markonni the bag of marijuana and was informed that he was being placed under arrest.

Agent Markonni testified that after identifying himself outside the airport, he asked defendant to accompany the agents to an office away from public view. The transcript reveals that Agent Markonni further testified as follows:

Q. Are you saying you did not have enough information at that time so that you could make a search?

A. I don't think so. I think if Mr. Miles had asked to go at that point, I think I probably would have let him go.

Q. Okay. He was not under arrest?

A. No, he was not, it was an anonymous telephone call, not really.

**1260**

Transcript at 18.

According to Agent Markonni, Miles accompanied the agents into the baggage room willingly and without any physical contact. As stated *supra*, once inside the baggage room Agent Markonni advised defendant of his rights [6] and asked permission to search defendant's suitcase.

Regarding Mr. Miles' freedom to leave at this point Agent Markonni later testified:

Q. Inside the baggage area, was Mr. Miles free to go, prior to the marijuana?

A. Prior to the marijuana, if he had walked in and said, I changed my mind, I think I would like to leave, he would have been free to go, as far as I was concerned.

Q. Did you tell him that?

A. No, I didn't tell him that.

Transcript at 25.

The testimony of Agent Seward as to the events that transpired between the stop outside of the terminal and the time when Agent Markonni asked to search is substantially the same as that of Agent Markonni. However, Agent Seward's perception of the situation, according to his testimony, is somewhat different.

Q. And at that point was Mr. Miles free to go on his business and ignore your request to go inside? I am asking about the reality of the situation, Agent Seward on that fact—I am not asking your legal opinion but I am asking whether under the reality of the situation on the sidewalk, is it fair to say that Mr. Miles could have just walked away?

**6.** On re-direct examination Agent Markonni was asked why he advised Mr. Miles of his rights if defendant was not then under arrest.
Q. Now, you advised him of this before any indication to him that you believed he was in possession of a quantity of narcotics; is that correct, sir?
A. No. I indicated that first; that I told him I believed he was in possession of a quantity of narcotics and immediately went into the advice of rights.
Q. Why did you do that at that point, sir, when Mr. Miles was not under arrest?

A. No, Sir.

Transcript at 49.

When he was later asked whether after Mr. Miles entered the baggage room he could have walked out unhindered had he chosen to do so, Agent Dykstra responded in the negative.

Q. All right. Now, is it also fair to say at this point, is it not, that Mr. Miles was not free to leave?

A. Yes, sir.

Q. That's fair?

A. Yes, sir.

Transcript at 52.

Agent Dykstra also testified that after the initial encounter defendant Miles would not have been free to just walk away from the agents.

Q. Okay. Did the subject resist in any manner?

A. No, sir; he did not.

Q. Show any reluctance to come along?

A. No, I believe he followed us freely.

Q. Okay. Now, you used the word believe again. Is this something you might have a recollection problem on or not?

A. I might have, but—

Q. You might have?

A. Yes. As I recall this incident, I believe he came with us freely.

Q. Okay. Let me ask it this way, if you have a recollection: Was he free not to follow you, in the reality of the situation? Do you have a recollection there?

A. Are you saying, did we give him an option?

A. Because Mr. Miles came out and said, well, yes, you are right, something like that, you know, as far as I was concerned, it was information that had to be checked out. Mr. Miles was a suspect to a certain degree, even though it was a anonymous telephone call. I find that it is better to advise them of their rights all the time than not to and suffer the consequences.
Q. Do you utilize that as a normal practice, then?
A. Yes, I do.
Transcript at 29–30.

Q. Well, yes, and I am not talking just words, I am saying, three federal agents approach a person outside the terminal at Metropolitan Airport; say, we are federal agents, show some sort of identification and say, please come along with us, or words in that manner. Could this gentleman have kept walking and walked off out of the premises, what would have happened, what—

A. He could have, but he didn't.

Q. Okay. What would have happened if he had kept walking, do you know— what would you have done if he had kept walking?

A. Probably would have stopped him and taken him into the baggage area.

Q. Okay. At least your best recollection at this point would be, you would have no intent just to let him walk away?

A. Yes, sir.

Transcript at 71–73.

The testimony of defendant Miles regarding the occurrences outside the airport differs significantly from that of the three agents.

Q. Outside the door of the terminal, did anything unusual happen to you?

A. Yes. Uh, three men approached me and one of them pulled out a—his ID showing me that he was a federal agent; and then I asked him, what did he want? And he—

Q. Okay. What did he say?

A. He said he wanted to talk with me. And I asked him, what for? He said he wanted to talk to me again. I asked him, do you have a warrant, you know, and he said he just wanted to talk to me. And I asked him, who he was looking for? He couldn't tell me that. I asked him what was my name and he couldn't tell me that.

*  *  *  *  *  *

Q. All right. What happened next? Was there any more conversation outside the terminal, at the door?

A. Yeah, well, I told him that I wasn't going anyplace; you know, they didn't have a warrant, he didn't know my name, he couldn't tell me what he wanted or anything; and I started to walk off and, I don't know which one, but one of them took me by the arm and said, we want to talk to you, only take a few minutes, you know, and I didn't—then they led me to the baggage room.

*  *  *  *  *  *

Q. Mr. Miles, before you went inside, to that baggage storage room, did you say anything in response to the comments after the agent took you by the arm—did you say, Okay, I'll go along—yes, I will—or any kind of response like that?

A. No, I just went along.

Q. You just went along. Okay. Did you feel you had a choice?

A. I had no choice.

Transcript at 82–84.

In *Manning v. Jarnigan,* 501 F.2d 408, 412 (6th Cir. 1974) the Court of Appeals for the Sixth Circuit established a "free to leave" test to determine when an arrest occurs.[7] Using this standard this Court must determine if Mr. Miles was free to leave at any time prior to his being formally placed under arrest by Agent Markonni after the marijuana was discovered by the agents. It is the opinion of this Court that he was not.

At the evidentiary hearing on this matter two of the three agents testified that in reality Mr. Miles did not have the option of merely walking away after he was requested to accompany the agents to the baggage room. Had he done so, the agents stated he would have been restrained.

■ Based on this testimony and on the entire record this Court finds that Mr. Miles was not free to leave the custody of the

7. "The critical question in our instant case appears to be when the arrest occurred. More precisely, was the appellant free to leave (at any time prior to the search) after the police officer flashed his spotlight on appellant's car?" 501 F.2d at 412.

three agents any time after they asked him to accompany them to the baggage room. His liberty of movement was restricted and, for the purposes of this case, the arrest was complete before the formal announcement of an arrest was made. Since this intrusion was without probable cause, the Court finds the arrest to have been an illegal one.

Having determined that the arrest was without justification, the Court does not reach the question of whether the subsequent search of Mr. Miles' luggage was invalid. See *Manning v. Jarnigan*, 387 F.Supp. 791 (E.D.Tenn.1974).

■ The exclusionary rule requires suppression of any evidence seized subsequent to an illegal arrest. See *Wong Sun v. United States*, supra.

It is therefore, ORDERED that the defendant's Motion to Suppress the evidence seized from the suitcase in his possession on August 4, 1975 be, and hereby is, granted.