**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
File Name: 05a0282n.06
Filed: April 13, 2005

No. 02-6505

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| **Plaintiff-Appellee,** | ) | |
| | ) | |
| | ) | |
| | ) | **ON APPEAL** FROM THE |
| v. | ) | UNITED STATES DISTRICT |
| | ) | COURT FOR THE EASTERN |
| STEPHEN KENDRICKS, | ) | DISTRICT OF TENNESSEE |
| | ) | |
| **Defendant-Appellant.** | ) | **O P I N I O N** |
| | ) | |
| _____ | ) | |

**Before: BATCHELDER and MOORE, Circuit Judges, and CALDWELL,*** **District Judge.**

**KAREN CALDWELL, District Judge.** Defendant-Appellant Stephen Kendricks

("Kendricks") appeals the district court's denial of his motion to suppress. Kendricks was convicted

by a jury on all nine counts of an indictment including two counts of armed bank robbery. He was

sentenced to imprisonment for 500 months. Prior to trial, Kendricks moved to suppress certain

evidence and statements made by him to law enforcement officers including a confession. The

district court denied the motion and we **AFFIRM** the district court's judgment.

**I. FACTS AND PROCEDURE**

A.      **The Magistrate Judge's Report and Recommendation.**

---

*The Honorable Karen K. Caldwell, United States District Judge for the Eastern District of
Kentucky, sitting by designation.

Kendricks was convicted by a jury on all nine counts of an indictment including two counts of armed bank robbery. Kendricks appeals his conviction arguing that, prior to trial, the district court incorrectly denied his motion to suppress certain evidence and statements made by him to law enforcement officers, including a confession. The district court referred the motion to the magistrate judge who conducted a hearing and entered a Report and Recommendation finding the following facts.

On August 3, 2001, Officer Joe Fletcher ("Fletcher") of the Chattanooga Police Department was patrolling in his car in his normal patrol area, the Alton Park/Piney Woods area. At 1:45 p.m., he heard over the police radio that 911 had received a call reporting that the First Tennessee Bank at 3503 Broad Street was being robbed. The police radio further reported that witnesses identified the robbers as two black men wearing black plastic and masks and that witnesses saw a brown or black convertible leaving the bank and heading towards 38th Street and Alton Park Boulevard.

Fletcher proceeded toward that area, turning onto 37th Street and heading toward Alton Park Boulevard. About two-tenths of a mile from the bank, Fletcher saw Kendricks, a black male, walking on the right shoulder of 37th Street toward Alton Park Boulevard. Kendricks was wearing a white t-shirt, dark jean shorts with the cuffs rolled up, and tennis shoes. The stretch of the road where Kendricks was walking had no sidewalks. There were no businesses in the immediate area but there was a bus stop and an elementary school farther down 37th Street. Fletcher did not see anyone else walking on the road. Shortly after Fletcher saw Kendricks, the police radio dispatch reported that the suspects, now three black males, had probably discarded their plastic clothing.

Fletcher stopped his patrol car in front of Kendricks and asked him to approach the car. Kendricks walked to the car. Fletcher exited the car and patted down Kendricks for weapons. The

officer then informed Kendricks of the bank robbery and said he "needed to talk to him to make sure if he was a part of it or not." After Kendricks identified himself to the officer, at 1:51:25 p.m., Fletcher informed the dispatcher that he had stopped Kendricks.

After Kendricks identified himself, Fletcher remembered that only a week or two earlier, a Chattanooga Police Department detective told Fletcher to be on the lookout for a Stephen Kendricks and Kendricks' friend, Tyrone Griffin ("Griffin"), because they were suspects in a recent robbery of a store in nearby St. Elmo. The detective also told Fletcher to be on the lookout for a white El Camino because Kendricks and Griffin drove a white El Camino.

Fletcher asked Kendricks what he was doing in the area, and Kendricks replied that he had been at the Pizza Hut applying for a job. Fletcher did not believe Kendricks' story because approximately one week earlier Fletcher had been called to the same Pizza Hut by the restaurant manager. On that date, the manager had informed Fletcher that Kendricks and Griffin had been in the restaurant to pick up Griffin's paycheck and the manager believed there were arrest warrants for the two men. When Fletcher arrived at the restaurant, the two had already left without Griffin's paycheck. Based on this event, Fletcher believed that both men knew they would not be welcome at the Pizza Hut.

Fletcher testified that he then advised Kendricks that "I was going to go back over to the bank with him to check to see if he was involved in the holdup. I said, 'If it's not you, I'll cut you loose.'" Fletcher opened the door and Kendricks entered the back of the patrol car. The back of the car is separated from the front with metal bars. The back doors are locked and cannot be opened from inside. Kendricks was not handcuffed and retained his cell phone.

Fletcher and Kendricks arrived at the bank at 1:54:40 p.m. Fletcher then asked the dispatcher

3

to call the Pizza Hut to see if a person matching Kendricks' description had been in the restaurant that morning. At 1:56 p.m., the dispatcher called back and reported that, according to Pizza Hut, no person meeting Kendricks' description had been in that morning. Fletcher then conducted a "show-up" in which he asked witnesses to the bank robbery if they could identify Kendricks as one of the robbers. The witnesses could not identify Kendricks because the men had worn black masks. Except for the show-up, Kendricks remained locked in the back of the police car parked in the bank lot. Fletcher viewed the bank video of the robbery and was unable to identify Kendricks in the video.

While still in the bank parking lot, Fletcher heard over the police radio that a witness had reported that two men had jumped out of the get-away car and hopped into a white El Camino with gold rims and red tinted windows. Fletcher remembered the earlier conversation in which the Chattanooga Police Department detective had informed him that Kendricks and Griffin drove a white El Camino. The first mention of the white El Camino on the incident summary report was at 2:25 p.m. when the dispatcher announced its location. The next reference occurs at 2:44 p.m., when the dispatcher advised officers to be on the lookout for the car because the robbery suspects may be in it.

FBI Agent Paul Healy ("Healy") arrived at the bank at approximately 2:10 p.m. and took over the investigation from the police department. He spoke with Fletcher, who told him about Kendricks and the Pizza Hut story. Healy went inside the bank to view the video of the robbery. Afterward, he approached the patrol car, opened the patrol car door and identified himself to Kendricks. In response to Healy's questions, Kendricks stated he had been at the Pizza Hut to apply for a job. Healy walked across the street to the Pizza Hut to talk to the manager, who denied that

4

anyone came in for a job application that day. The magistrate judge found that Healy was at the Pizza Hut for 40 to 45 minutes.

When Healy returned, he spoke with fellow FBI agent Wayne Jackson, who told Healy that Kendricks had told him that he had gone to the Pizza Hut to see a friend. Jackson orally advised Kendricks of his *Miranda* warnings before asking him any questions. Healy then opened the back of the patrol car and allowed Kendricks to stand outside for a short time though Kendricks was not allowed to move far from the car. Healy did not search Kendricks in the parking lot because he was aware of the police department's policy of patting down a suspect before putting him in a patrol car. Because of the discrepancies in the stories that Kendricks gave to him and to Jackson, and because Healy knew Kendricks was lying about going to the Pizza Hut to apply for a job, Healy decided he would like to question Kendricks further at the FBI office in downtown Chattanooga.

Healy testified that, "I told Mr. Kendricks that it was [sic] inconsistencies in his statement, and I'd like him to come to the FBI office so we could further investigate." Later in the suppression hearing, Healy testified that he told Kendricks, "please come down to the FBI office so we can straighten this out." Still later in the hearing, Healy testified that he told the defendant, "We've got some inconsistencies here, you know. You need to come down, please come down with us to the FBI office and, you know, we could straighten this out" and "you need to get this straightened out." Healy did not tell Kendricks he did not have to come. He did not issue Kendricks his *Miranda* warnings prior to Kendricks' arrival at the FBI office.

Fletcher drove Kendricks to the FBI offices. He was not handcuffed and was allowed to keep his cell phone. When they arrived, Healy "informed [Kendricks] I was going to search him, just as a matter of policy, before he came in our spaces." Healy further testified that, "what I was

5

looking for is [sic] any weapons, narcotics, knives, those type items." Healy started the search by rolling down Kendricks' pant legs. Healy then saw pink dye on the cuff consistent with dye used in bank robbery dye packs. Healy testified that he also searched Kendricks' pockets and found a receipt from the Suburban Lodge Motel, and $120 in cash stained by the dye used in dye packs. Healy testified that he did not think the dye- stained money in the defendant's pocket came from the bank robbery which occurred that morning because the money was too clean. It looked as if the money had been washed. He knew of two previous bank robberies which had occurred recently where dye packs had exploded and he had been called by businesses recently to come look at pinkish stained money so he knew that dye-stained money was in circulation.

After the search, Healy took Kendricks to the fifth floor where the FBI offices were located. They went to an interview room a few feet from the front door which is kept locked. A deputy from the county sheriff's department joined them for the interview. At 3:01 p.m., Healy read Kendricks his *Miranda* warnings from an "advice of rights" form which he then had Kendricks read and sign. The items found on Kendricks were placed in front of him. Healy testified that he told Kendricks he could leave but that Kendricks consented to the interview. Sometime during the interview, Healy told Kendricks that, if he could call a family member to come pick him up, he could leave. Kendricks called his brother, a cousin and a girlfriend on his cell phone, but no one came to pick him up.

Because of inconsistencies in Kendricks' story, Healy left the building to obtain a search warrant for Kendricks' room at the Suburban Lodge. Kendricks remained in the interview room with Jackson. The search of the Suburban Lodge room was conducted at 10:55 p.m. and Healy found dye-stained money in dissolving fluid, dry money with a pink stain on it, packaging for masks and

6

other incriminating items.

Jackson went into the interview room at about 5:00 or 5:30 p.m. when Healy left to obtain the search warrant. Jackson testified that, prior to that time, "Healy had been with [Kendricks] for a while. And some of the time they were with him, they were fingerprinting him and photographing him and, you know, doing different things." Jackson talked with Kendricks from 5:00 or 5:30 p.m. until midnight. During that time, Kendricks was given bathroom breaks, sodas and was offered something to eat. He was told he could leave if he could contact a family member to pick him up. Kendricks made some calls but no one came to pick him up. At about 11:00 p.m., Kendricks admitted to being involved in the bank robbery.

Based on these facts, the magistrate judge concluded that the officers lawfully detained Kendricks based upon reasonable suspicion until the time that Healy walked to the Pizza Hut. The magistrate judge found that the only thing Healy could accomplish by going to the Pizza Hut was to confirm what the dispatcher had already told Fletcher, i.e., that Kendricks had lied about being in the Pizza Hut that morning. At the point that Healy left for the Pizza Hut, the magistrate judge concluded, the officers were simply holding Kendricks hoping that a new lead would arise. Absent probable cause to arrest him, the magistrate judge concluded that Kendricks should have been released. The magistrate judge also determined that "a reasonable person in Kendricks' position would not have felt he had a choice about whether to go to the FBI office."

The magistrate judge determined that the illegal detention of Kendricks enabled the search of his person at the FBI office; his questioning and confession at the FBI office; and the search of the Suburban Lodge room. Citing to *Wong Sun v. United States*, 371 U.S. 471, 487-88 (1963), the magistrate judge determined that the evidence obtained as a result of these events should be

7

suppressed as "fruit of the poisonous tree."

Accordingly, the magistrate judge recommended that the motion to suppress be granted as to 1) the statements made by Kendricks after Agent Healy's interview of the defendant in the bank parking lot; 2) the evidence found on Kendricks' person when Agent Healy searched the defendant at the FBI office; and 3) all evidence found during the search of the Suburban Lodge room. The magistrate judge further recommended, however, that Kendricks' motion be denied as to the statements he made to Fletcher on 37th Street and to Agent Healy in the bank parking lot before Healy left for the Pizza Hut. The government filed objections to the magistrate judge's Report and Recommendation.

**B.      The District Court's Order**.

In its Order, the district court adopted all but two of the magistrate judge's findings of fact. The first fact concerned the amount of time that Healy was at the Pizza Hut across the street from the bank. Citing to the transcript of the hearing and the timeline otherwise established by the magistrate judge's Report and Recommendation, the district court determined that the magistrate judge had mistakenly concluded that Healy spent forty to forty-five minutes at the Pizza Hut when he was actually at the *crime scene* for that time period. The district court determined that Healy's trip to the Pizza Hut could not have taken more than a few minutes.

The district court's second exception to the magistrate judge's findings of fact concerned the time when Healy learned of Kendricks' connection to the white El Camino. The magistrate judge had determined that Healy and Jackson did not know about Kendricks' connection to the white El Camino until they questioned him at the FBI office. The district court determined, however, that Healy learned about the El Camino when he returned from the Pizza Hut. In reaching this

8

conclusion, the district court cited to Healy's testimony at the suppression hearing in which Healy indicated that he "found out about the vehicles" upon his return from the Pizza Hut.

The district court determined that the officers acted quickly and diligently to investigate their suspicions about Kendricks and that he was not detained in the bank parking lot longer than reasonably necessary. The district court also determined that Healy effectively arrested Kendricks when he took him to the FBI office, where he was searched, advised of his *Miranda* warnings and interrogated. The district court recognized that Healy told Kendricks that he was free to leave on more than one occasion but noted also that Kendricks was transported to the FBI office in a locked car, effectively strip searched, dispossessed of his personal belongings, interviewed in a locked room, fingerprinted and photographed. Thus, the district court concluded, in view of all the circumstances, the officers had restricted Kendricks' liberty in such a way that a reasonable person would not believe he was free to leave.

The district court therefore denied in full Kendricks' motion to suppress. Though it is not stated in the district court's Order, it is presumed that, having determined that Kendricks was lawfully arrested, the district court determined that the search of Kendricks at the FBI offices was a lawful search incident to arrest.

## II. ANALYSIS

In reviewing the district court's denial of defendant's motion to suppress evidence, this court reviews the district court's factual findings for clear error and reviews its conclusions of law *de novo*. *United States v. Freeman*, 209 F.3d 464, 466 (6th Cir. 2000).

One of the well established exceptions to the warrant requirement of the Fourth Amendment is the search incident to arrest. *See e.g.*, *Michigan v. DeFillippo,* 443 U.S. 31, 35 (1979); *Chimel*

9

*v. California*, 395 U.S. 752, 762-63 (1969). Once a suspect is arrested based on the existence of probable cause, officers may conduct a warrantless search of the suspect's person and of the area within the suspect's immediate control. *Chimel*, 395 U.S. at 762-63.

On appeal, Kendricks argues that the district court incorrectly determined both that he was arrested and that there was probable cause to arrest him at the time he was taken to the FBI offices. "It does not take formal words of arrest or booking at a police station to complete an arrest." *Manning v. Jarnigan*, 501 F.2d 408, 410-411 (6th Cir. 1974); *See also Gardenhire v. Schubert*, 205 F.3d 303, 313 (6th Cir. 2000). A "seizure" within the meaning of the Fourth Amendment occurs when, "in view of all the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980).

Here, there is no real dispute as to whether Kendricks was, in fact, arrested when he was taken to the FBI office. The magistrate judge and the district court both determined that Kendricks would not have reasonably felt free to leave from the point that he was transported to the FBI offices in the patrol car. As to Kendricks, while he disputes that he was arrested, he also points out that Fletcher transported him in the rear of a police cruiser to the FBI office; that the rear of the police cruiser had no operating door locks; and that, upon arriving at the FBI office, Fletcher physically took Kendricks by the arm and escorted him into the FBI building. Kendricks himself argues that, "[i]n these circumstances, a reasonable person would conclude he was not free to leave."

The Court also notes that Healy had indicated to Kendricks that Kendricks needed or, at the least, should to go to the FBI offices to straighten out inconsistencies in his statements; that Healy advised Kendricks of his *Miranda* warnings upon arrival at the FBI offices and had him sign a waiver of rights; that, after arriving at the FBI offices, Kendricks was taken to a locked interview

10

room; that he was fingerprinted and photographed; and that the front door to the FBI's office is kept locked.

As the district court noted, the agents told Kendricks he was free to leave three times after he was placed in the interrogation room. It appears that in, at least, two instances, however, Kendricks' freedom to leave was conditioned on someone coming to the FBI offices to get him. In these instances, the officers did not give Kendricks complete freedom to walk out of the office. The district court correctly determined that, considering all of these circumstances, Kendricks was, in fact, arrested when he was taken to the FBI office.

Kendricks does not dispute that his detention and questioning by officers was permissible up until the time he was taken to the FBI office. Thus, the real dispute here is whether probable cause existed to arrest Kendricks at the time he was taken to the FBI office. As to this issue, Kendricks disputes the district court's finding that Healy knew of Kendricks' connection to the white El Camino prior to taking Kendricks to the FBI office. Kendricks argues that the only information known by Healy at that time linking Kendricks to the robbery was that he was, like the suspects, a black male and that he was near the bank and had given inconsistent and possibly untrue statements about his whereabouts.

Probable cause exists where the facts and circumstances within the officers' knowledge and of which they had reasonably trustworthy information are sufficient to cause a person of reasonable caution to believe that an offense has been or is being committed by the person to be arrested. *Dunaway v. New York*, 442 U.S. 200, 208 n.9 (1979). "The test for the existence of probable cause is wholly objective." *United States v. Anderson*, 923 F.2d 450, 456 (6th Cir. 1991). "[T]he subjective belief of the arresting officer is irrelevant in determining whether probable cause exists." *Id*. at 457.

11

As an initial matter, the Court is unable to find, based on the evidence in the record, that the district court clearly erred in finding that Healy knew about the white El Camino prior to taking Kendricks to the FBI. At the suppression hearing, Healy confirmed that he "found out about the vehicles" when he returned to the bank from the Pizza Hut. This would certainly indicate that he learned about the white El Camino at that time.

More importantly, however, for purposes of determining whether probable cause existed to arrest Kendricks, it is irrelevant whether Healy knew about the white El Camino and Kendricks' connection to it. This is because it is undisputed that, prior to taking Kendricks to the FBI office, Healy's law enforcement colleague, Fletcher, knew about the white El Camino and Kendricks' connection to it. "Many circuits, including our own, have determined that probable cause may be established from the collective knowledge of the police rather than solely from the officer who actually made the arrest." *Collins v. Nagle*, 892 F.2d 489, 495 (6th Cir. 1989) (citing *United States v. Calandrella*, 605 F.2d 236, 246 (6th Cir. 1979); *United States v. Killebrew*, 594 F.2d 1103, 1105 (6th Cir. 1979); *United States v. McManus*, 560 F.2d 747, 750-51 (6th Cir. 1977); *United States v. Woods*, 544 F.2d 242, 259-60 (6th Cir. 1976)).

At the time that Kendricks was taken to the FBI office, the facts and circumstances collectively known by the Chattanooga Police Department and the FBI were that 1) Kendricks met the general description of the suspects; 2) he was walking only .2 miles from the bank in the area where the robbery get away car had been heading; 3) the robbery had occurred only 5 to 15 minutes before Fletcher spotted Kendricks; 4) one or more of the suspects might be on foot; 5) Kendricks was walking in an area where Fletcher, who regularly patrolled this area, did not often see people walking; 6) Kendricks was suspected of another recent armed robbery of a business in the area; 7)

12

Kendricks had given false and inconsistent stories to law enforcement officers and agents regarding where he had been that day; 8) the robbery suspects had ditched the getaway car and hopped into a white El Camino; and 9) Kendricks drove a white El Camino.

Considering the totality of these facts and circumstances collectively known by Healy, Jackson and Fletcher, probable cause existed to arrest Kendricks at the time he was taken to the FBI office. Accordingly, the search of Kendricks at the FBI office was a lawful search incident to arrest; the fruit of the poisonous tree doctrine does not apply to exclude any of the evidence obtained as a result of the arrest; and the district court properly denied Kendricks' motion to suppress.

### III. CONCLUSION

For the foregoing reasons, we **AFFIRM** the district court's Order denying Kendricks' motion to suppress.