**UNITED STATES of America, Plaintiff**

v.

**Demond WASHINGTON, Defendant.**

**Case No. 3:13CR179.**

United States District Court,
N.D. Ohio,
Western Division.

Jan. 13, 2014.

Alissa M. Sterling, Office of the U.S. Attorney, Toledo, OH, for Plaintiff.

Sheldon S. Wittenberg, Wittenberg, Phillips, Levy & Nusbaum, Toledo, OH, for Defendant.

### ORDER

JAMES G. CARR, Senior District Judge.

This is a criminal case in which the government has charged the defendant Demond Washington with being a felon in possession of a firearm. Pending is his motion to suppress the weapon, which an officer of the Toledo Police Department (TPD) found and seized incident to a traffic stop. (Doc. 12). Following a hearing on August 23, 2013, and subsequent briefing, the motion is decisional.

For the reasons that follow, I grant the motion.

### Background

On February 6, 2013, shortly before 1:00 a.m., TPD Officers Thomas Reinhart and Jason Picking were on patrol near the intersection of Monroe and Upton Streets. Ahead of them northbound on Upton they saw the defendant make a left turn onto Monroe without using a signal. They stopped his vehicle after they too completed the turn. Officer Reinhart testified that there was no foot or vehicle traffic in the area during the stop.

Officer Reinhart approached the driver's side; Officer Picking the passenger side. The defendant was alone. In response to a request for his license and vehicle registration, he provided his driver's license and told the officers the car was a rental.

The officers returned to their patrol car to confirm the validity of the defendant's license and run a "wants and warrants" check. They determined that the defendant's license was valid, there were no warrants for his arrest, and he was on parole (for a gun offense, according to Officer Picking). Officer Picking, who previously was a Metro Drug Task Force member, recognized the defendant's name from information he had received from a confidential informant about the defendant's alleged drug trafficking.

In light of what they knew (or believed) about the defendant's background, the officers decided to try to obtain his consent to search his car. Before doing so, Officer Reinhart had written a citation for failure to signal a turn.

During the suppression hearing Officer Reinhart stated that he knew there was no "valid, justifiable reason to search," so he

had to ask Washington for consent. (Doc. 17, at 56). When the government asked Officer Picking what would have happened if Washington had refused consent, Officer Picking stated, "We would have gave [*sic*] his license back, and he would have been free to go." (*Id.*, at 68).

Officer Reinhart went to the driver's door; Officer Picking stood by the driver's side back door. While still holding the license and ticket, Officer Reinhart asked the defendant if he had anything illegal. He said he did not. The officer asked if he minded if they searched the vehicle. The defendant stated he did not mind. Officer Reinhart asked him to get out of the car; the defendant did so.

Once the defendant was out of the car, Officer Reinhart grabbed his belt on the backside and moved him toward the rear to hand him over to Officer Picking. As Officer Reinhart was guiding the defendant alongside the car, Officer Picking noticed a bulge in the front of defendant's t-shirt.

Suspecting (and reasonably so) that the bulge may have concealed a firearm, Officer Picking reached for, found, and took the firearm at issue here from the defendant's waistband. Thereafter, the officers arrested the defendant. By then, the encounter had lasted about seven minutes. (Doc. 17, at 35, 66).

The officers took the defendant to the Lucas County Jail for booking. Once there, they left the citation with the items taken from the defendant.

The issue in this case is not the lawfulness of either the stop, which is not in dispute, or of what initially happened thereafter. The issue is, rather, whether, once the officers had confirmed the validity of the driver's license and lack of any warrants and prepared the citation, continuing the stop to try to obtain his consent to search his car was lawful. If so, I must overrule the motion; if not, I must grant it.

For the reasons that follow, I conclude that the totality of the circumstances establishes that when, while holding onto the defendant's driver's license and citation, Officer Reinhart requested permission to search the vehicle, the stop was no longer lawful and, in any event, the defendant's consent to the search was the consequence of coercive circumstances, rather than voluntary.

### Discussion

On the surface, what happened here is routine: officers often ask motorists if they have any firearms, drugs, or other contraband in their vehicles, and almost as often the answer is no. Once the motorist, by his negative answer having suggested he would have no reason to fear a search, officers then ask if they can "look around," or, as here, conduct a search of the vehicle. Courts consistently and uniformly find nothing unlawful in these routine circumstances. *See, e.g., Florida v. Royer*, 460 U.S. 491, 497, 103 S.Ct. 1319, 75 L.Ed.2d 229 (1983); *United States v. Erwin*, 155 F.3d 818, 820 (6th Cir.1998) (en banc) ("the Constitution does not mandate that a driver, after being lawfully detained, must be released and sent on his way without further questioning.").

▮ There is, however, a crucial constitutional predicate to the lawfulness of such routine practices: namely, the person to whom the officers put their questions must feel free to say no and depart. *Florida v. Bostick*, 501 U.S. 429, 434, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) ("Whenever a reasonable person would feel free to disregard the police and go about his business, the encounter is consensual and no reasonable suspicion is required.") (internal citations and quotations omitted); *see also Erwin, supra*, 155 F.3d at 823 ("[C]onsent is not

vitiated merely because the valid suspicion of wrongdoing for which an individual has been stopped proves to be unfounded or does not result in prosecution *and the individual is free to go before being asked.*") (emphasis supplied); *United States v. McCall,* 433 Fed.Appx. 432, 437 (6th Cir.2011).

■ The test in these circumstances is objective: namely, whether a reasonable person would, under all the particular circumstances, feel free to ignore the officer, decline to respond as the officer desired, and leave. This standard applies to pedestrians, *United States v. Beauchamp,* 659 F.3d 560, 571–72 (6th Cir.2011) (holding that police conduct "prevented [defendant] from exercising his right to walk away, and, in effect, to say 'no' "), and motorists alike. *United States v. Richardson,* 385 F.3d 625, 630 (6th Cir.2004) (holding that "words alone were enough to make a reasonable person in [the driver's] shoes feel that he would not be free to walk away"); *see also United States v. Jordan,* 958 F.2d 1085, 1087 (D.C.Cir.1992) ("[O]nce the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it.").

■ The government points to the brevity of the stop. To be sure, a stop of only seven minutes is well within the durational zone that courts have found permissible. *See, e.g., United States v. Marsh,* 443 Fed. Appx. 941, 943 (6th Cir.2011) (unpublished opinion) (fifteen-minute traffic stop was reasonable). But duration alone is not determinative. What matters is the stage of the process and when the officers had completed those normal and lawful· activities typically incident to a traffic violation. *Muehler v. Mena,* 544 U.S. 93, 100–101, 125 S.Ct. 1465, 161 L.Ed.2d 299 (2005) (quoting *Illinois v. Caballes,* 543 U.S. 405, 407, 125 S.Ct. 834, 160 L.Ed.2d 842 (2005)) (a lawful seizure "can become unlawful if it is prolonged beyond the time reasonably required to complete that mission").

In this case, I find as a matter of fact that the officers had completed all activities incident to the stop, except serving the citation and returning the license, by the time they returned to the defendant's vehicle. Had they given those items to the defendant at that point, there would be no basis for challenging what happened next.

But Officer Reinhart did not give the defendant the license and citation. He was still holding them when he asked if the officers could search the vehicle. At that point, the officer had abandoned the prosecution of the traffic stop and embarked on a new course of investigation. Under *United States v. Everett,* 601 F.3d 484, 495 (6th Cir.2010), this "bespeak[s] a lack of diligence" and, under the totality of circumstances, transformed an ordinary traffic stop into an unreasonable seizure.

The dispositive issues are: 1) did the ensuing questions occur during a period, albeit brief, of unlawful detention, and, if so, whether such detention tainted the defendant's consent, even if deemed voluntary; and, 2) alternatively, was the totality of the circumstances such as to create coercive pressures rendering his consent involuntary.

■ Because Officer Reinhart had his license and the ticket, the defendant was not free to leave, and thereby make clear he did not want to continue talking with the officer. No reasonable driver would leave following a traffic stop unless the officer, in effect, has given him leave to do so by giving back his driver's license and either a ticket or a written or verbal warning.

The tainting effect of keeping the defendant in place by holding onto the license and ticket directly led to Officer Picking's observation of the bulge and seizure of the firearm. While unable to leave, the defendant agreed to Officer Reinhart's request to search. This, in turn, led directly to the officer's instruction, albeit itself otherwise sensible and lawful, to the defendant to get out of the car. The defendant having complied, as he had to, Officer Picking saw the bulge and reached for and took the gun. Thus the taint of not being free to leave when the law allowed the defendant to do so extends to seizure of the weapon. *See United States v. Culp,* 860 F.Supp.2d 459, 466–68 (W.D.Mich.2012) (granting motion to suppress evidence because officer unlawfully prolonged traffic stop which directly led to seizure of contraband).

I conclude, further, that the unlawful detention, albeit brief, and however "routine" it may have been, tainted the defendant's resulting consent.

■ When officers continue to question during an unlawfully prolonged detention following a traffic stop, ensuing consent is tainted and evidence seized must be suppressed under the fruit of the poisonous tree doctrine. *Royer, supra,* 460 U.S. at 507–508, 103 S.Ct. 1319 (holding that because consent to search was a product of an unlawful detention, "the consent was tainted by the illegality and was ineffective to justify the search"); *see also Florida v. Bostick,* 501 U.S. 429, 433–34, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (noting that if consent was given during the course of an unlawful seizure, the results of the search "must be suppressed as tainted fruit"); *United States v. Lopez–Arias,* 344 F.3d 623, 629 (6th Cir.2003) ("[I]f a consent to search is given after an illegal seizure, evidence obtained pursuant to the consent to search must be suppressed, unless the consent is sufficiently attenuated from the illegal seizure such that the consent is the product of an intervening act of free will."); *United States v. Blanco,* 844 F.2d 344, 350 (6th Cir.1988) ("If such a consent is itself the fruit of a Fourth Amendment violation, however, the consent, under the controlling case law, is deemed a nullity."). Thus, the seized firearm must be suppressed because it is tainted fruit.

In any event, I conclude, in the alternative, that the circumstances, when viewed in their totality, were such that the defendant's consent was not voluntary.

■ In this Circuit, the standard for determining whether consent to search is voluntary is the totality of the circumstances. *Manning v. Jarnigan,* 501 F.2d 408, 412 (6th Cir.1974) (the question is, "[b]ased on the totality of the circumstances, was the consent to search appellant's car freely and voluntarily given under the standards set for this in *Schneckloth v. Bustamonte,* 412 U.S. 218, 228–229, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973)?"); *see also Schneckloth, supra,* 412 U.S. at 227, 93 S.Ct. 2041 ("[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances."); *United States v. Simmons,* 202 Fed.Appx. 82, 86 (6th Cir. 2006) (unpublished disposition).

■ Applying this standard, I find the defendant did not freely and voluntarily give consent to Officer Picking. This is so because the totality of the circumstances were coercive.

First, retention of the license and ticket was itself coercive. Officer Reinhart held, in effect, as a virtual leash the defendant's driver's license. Doing so, he necessarily kept the defendant in place until he re-

turned the license.[1] As the Fifth Circuit noted in *United States v. Cavitt*, 550 F.3d 430, 439 (5th Cir.2008), "an officer's retention of identification documents suggests coercion."[2] *See also United States v. Weaver*, 282 F.3d 302, 311 (4th Cir.2002) ("[I]f an officer retains one's driver's license, the citizen would have to choose between the Scylla of consent to the encounter or the Charybdis of driving away and risk being cited for driving without a license."); *United States v. Robinson*, 690 F.2d 869, 875 (11th Cir.1982) (finding that the length of the officer's retention of defendant's identification document was an "important factor" in the court's analysis);[3] Aidan Taft Grano, Note, *Casual or Coercive? Retention of Identification in Police–Citizen Encounters*, 113 COLUM. L. REV. 1283, 1299–1306 (2013) (discussing circuit courts' willingness to find retention of identification documents as coercive).

Other aspects of the encounter contributed to create a situation in which both the defendant and a reasonable driver would not have felt free to disregard the officer's request for consent. Two armed police officers were involved in the encounter, and, at the outset flanked the vehicle. To be sure, that they did so in the interest of their own safety was both sensible and lawful. But still that two, and not just one officer were involved directly added a modicum of coerciveness to the situation. This is so, even though neither officer drew his weapon and otherwise, no doubt, were entirely professional in their interaction with the defendant. *United States v. Hearn*, 496 F.2d 236, 244 (6th Cir.1974) (number of officers present is a factor in determining coercion).

The encounter occurred at night, in an area that, at that hour, was deserted, and near an intersection without traffic passing by. These happenstance circumstances would enhance whatever sense of isolation and solitude a reasonable driver would normally feel at such hour and location. Had the encounter occurred in daylight and in an area of pedestrian and other activity, a reasonable driver might have felt less concern about his own well-being as the encounter unfolded.[4]

1. Indeed, a driver who tried to leave in his vehicle probably would be breaking the law. Under O.R.C. §§ 4507.35 & 4510.12, Ohio law requires drivers to have their licenses in their possession whenever operating a vehicle on a public roadway.

    Aside from possible issues of eluding a police officer, someone who drives off while an officer is still holding his license would be committing a further traffic offense, and expose himself to chase, stop, and, at best, a second ticket. Indeed, at that point, the law might give the officer the authority to detain the individual and thus give the officers a now lawful opportunity to ask his "mind if we look around" questions. *Cf. Illinois v. Wardlow*, 528 U.S. 119, 124–25, 120 S.Ct. 673, 145 L.Ed.2d 570 (2000) (unprovoked flight from an officer justifies a *Terry* stop).

2. The Tenth Circuit has even established a bright-line rule holding that "an encounter initiated by a traffic stop may not be deemed consensual unless the driver's documents

have been returned to him." *E.g., United States v. Gonzalez–Lerma*, 14 F.3d 1479, 1483 (10th Cir.1994), *overruled on other grounds*, *United States v. Davis*, 636 F.3d 1281 (10th Cir.2011).

3. How long Officer Reinhart held on to the license once he had done everything but give it back should not be dispositive here. Once done with his lawful business, keeping it in his hand, rather than handing it over, has a coercive effect. Keeping it much longer would not have been merely coercive—it would have been compulsive. In any event, the period of retention between completion of the other, lawful activities and asking and getting responses to his questions, whatever those responses may be, will usually be no longer than the period here.

4. In *United States v. Drayton*, 536 U.S. 194, 204, 122 S.Ct. 2105, 153 L.Ed.2d 242 (2002), in response to defendant's argument that a

I find, accordingly, that when, after Officer Reinhart asked the defendant if minded if they searched his car, and the defendant acquiesced, his assent was more the product of coercive circumstances than free and voluntary. Because seizure of the gun occurred only after the defendant stepped out of his car, the initial illegality of his consent tainted Officer Picking's sighting and seizure of the gun.

### Conclusion

It is, accordingly,

ORDERED THAT the defendant's motion to suppress (Doc. 12) be, and the same hereby is granted.

So ordered.

police encounter on a bus was coercive, the Supreme Court stated, "Indeed, because many fellow passengers are present to witness officers' conduct, a reasonable person may feel even more secure in his or her decision not to cooperate with police on a bus than in other circumstances." Here, however, a reasonable person would have a lessened sense of security and be less inclined to refuse to be cooperative.