**IN THE SUPREME COURT OF PENNSYLVANIA**
**EASTERN DISTRICT**

**SAYLOR, C.J., BAER, TODD, DONOHUE, DOUGHERTY, WECHT, MUNDY, JJ.**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | : | No. 39 EAP 2018 |
| | : | |
| Appellee | : | Appeal from the Order of the Superior |
| | : | Court entered on 6/11/18 at No. 1567 |
| | : | EDA 2017 reversing the order entered |
| v. | : | on 4/20/17 and remanding to the Court |
| | : | of Common Pleas, Philadelphia County, |
| | : | Criminal Division at No. CP-51-CR- |
| HAROLD COST, | : | 0009310-2015 |
| | : | |
| Appellant | : | ARGUED: September 11, 2019 |

***OPINION***

**CHIEF JUSTICE SAYLOR**                    **DECIDED: January 22, 2020**

In this case arising under the Fourth Amendment to the United States Constitution, the issue accepted for review concerns the impact -- on the question whether a seizure has occurred during a police-citizen encounter -- of an officer's retention of an individual's identification card. The question distills to whether a reasonable person would feel free to ignore the police presence and proceed about his business while, amongst the other circumstances presented, the person is questioned by police as an officer continues to hold his identification and conducts a warrant check.

Appellant was arrested for various firearms offenses and filed a motion to suppress. At an ensuing hearing, the lead investigating officer initially explained that he was patrolling a high crime area in Philadelphia in an unmarked vehicle at

approximately 9 p.m., when his partner observed Appellant and three other individuals in an alley.[1] The officer suspected "there might be something going on back there." N.T., April 20, 2017, at 7-8, 10 (expressing the concern that the individuals may have been "gambling, you know, maybe smoking a little weed . . .."). Thus, the policemen circled the block and stopped the vehicle in front of the alleyway to conduct an investigation. *See id.* at 11. According to the officer, he did not activate the vehicle's emergency sirens or lights. *See id.* at 13.

The officer further explained that, when he and his partner alighted from their vehicle, he announced "police," in particular, because the officers were in plain clothes. *Id.* at 11, 26, 30, 53. He then asked the subjects if any of them "live back there," to which they replied in the negative. *Id.* at 10. Proceeding to ask if the individuals "had ID," the officer testified that all of them handed him identification cards of some sort. *Id.* The officer then asked "was there anything -- you guys have anything on you I need to know about," to which they also said no. *Id.*

The officer testified that Appellant was removing a backpack, which prompted the officer to ask, "you have anything in that backpack I need to know about?" *Id.* At that point, Appellant admitted that he had a gun in the bag. *See id.* Subsequently, the partner recovered a handgun.

Additionally, the officer related that he and his partner were in plain clothes, but that an "outer carrier" displayed a badge number; they had law-enforcement necklace medallion badges hanging from their necks; and they wore vests displaying a police

---

[1] On direct examination, the officer testified that Appellant was accompanied by two others. *See, e.g.*, N.T., April 20, 2017, at 9-10. However, on cross-examination and redirect, he indicated that there were three other individuals present, *see id.* at 42, 51-52, and the suppression court accepted such evidence. *See Commonwealth v. Cost*, CP-51-CR-0009310-2015, *slip op.* at 1 (C.P. Phila. July 10, 2017).

insignia on the backs.  *See id.* at 12, 26.  According to the officer, Appellant didn't have to answer questions or produce identification; rather, his path was unrestricted, and he could have "walked off at any time."  *Id.* at 35, 50-51.  The officer also affirmed that he did not remove his service weapon from his holster or put his hand on the holster.  *See id.* at 11, 13.  It was the officer's testimony that the entire encounter, through the question about the backpack, lasted less than a minute.  *See id.* at 47.

On cross-examination, the officer related that he had not witnessed any criminal activity.  *See id.* at 20.  Further, he engaged in the following discussion with defense counsel concerning his posture:

> Q.  When you and your partner stopped this group of males, one of you stands on the one side and one of you stand[s] on the other in your field interview stance or some other stance?
>
> You know what I'm talking about, right?
>
> A.  Yes.
>
> Q.  Let me qualify that.
>
> Officer, we can agree that a field interview stance, you're taught at the academy, blade your body, gun away from the person that you receive as your threat when you interview them to talk to them; is that fair?
>
> A.  Yes.

*Id.* at 31.  Additionally, the officer confirmed that he did not specifically tell the four subjects of the inquiries that they were free to leave.  *See id.* at 31, 36.

The officer also clarified that he "ran [the] names" of the individuals through a police dispatcher, and that "nothing came back bad."  *Id.* at 32.  In this respect, he elaborated:

I didn't run their names until after we had -- we were doing all of this simultaneously. I hadn't asked them if they had anything on them I need to know about first.

\* \* \*

We have to run them over the air. We have to wait for the dispatcher to respond. In the midst of all that, I still don't have clarification so, yes, I did ask them if they had anything else on them.

32-33; *see also id.* at 47 ("[I]t's all, like, a simultaneous thing.").[2]

In a later interchange, the officer indicated that he had written down the information from the identifications, but he did not specifically clarify when this had occurred:

Q. . . . So when you say everything was written down, either you or your partner were writing in your patrol car the ID information they gave you; isn't that right?

A. On a notepad or something, we jotted down everybody's name and date of birth that they gave, and their addresses.

*Id.* at 42.[3]

---

[2] In tension with his suggestion that *he* ran the IDs, the officer later stated, "I don't know if I was running the person or if [the partner] was running the IDs." *Id.* at 47-48.

[3] The Commonwealth also presented testimony from the lead officer's partner, apparently for the limited purpose of evidencing that the officers had received a priority radio call reporting that shots were fired several blocks from the location of the encounter. *See* N.T., April 20, 2017, at 56. The primary testifying officer did not recall any such radio call, however. *See id.* at 10.

The partner also testified that there had been a third officer present during the encounter, albeit on cross-examination he acknowledged that there was no mention of the radio call or a third officer in the arrest memorandum. *See id.* at 58. In the latter regard, in argument to the suppression court, the district attorney said that the partner, "I submit, is misremembering." *Id.* at 68.

The suppression court awarded the exclusionary remedy at the conclusion of the hearing, initially explaining as follows:

> Here's where I am: I think the officer's okay up to the point that I hear this one question: Anything in there that would hurt me. That's what you ask when the guy is under arrest. You are going to go in there and now I'm going to do my usual patdown for weapons. I don't want to get stuck with a needle. So when we get to that point, we're way past everything else.
>
> We can ask for ID. . . . [T]he asking for ID is okay as long as there's nothing too authoritative which would cause coercion, nothing the officer does to escalate the incident, there's no show of force, no weapons shown by the police or blocking of exits, no induce[ment] of cooperation by way of coercive means, and no curtailment of liberty.
>
> You know, the cases we see is where he asked for IDs, the guy puts -- goes in his pocket, does threatening gestures, or some kind of [non]cooperation. I didn't see any of that in this case. Based upon that, I'll grant the motion to suppress.

N.T., April 20, 2017, at 71-72.

The Commonwealth lodged an interlocutory appeal, and the suppression court issued an opinion under Rule of Appellate Procedure 1925(a). Initially, the court explained that warrantless searches are not permitted under the Fourth Amendment to the United States Constitution unless conducted pursuant to a recognized exception to the warrant requirement. *See Cost*, CP-51-CR-0009310-2015, *slip op.* at 2 (citing *Commonwealth v. Key*, 789 A.2d 282, 287 (Pa. Super. 2001)).[4] Further, the court

---

[4] The suppression court grounded its ruling exclusively on the Fourth Amendment. *See Cost*, CP-51-CR-0009310-2015, *slip op.* at 4. As such, and given that no claim has been raised in this case that the Court should depart from Fourth Amendment jurisprudence on state constitutional grounds, the assessment here has proceeded, and will continue to proceed, under Fourth Amendment principles. *Accord Commonwealth v. Au*, 615 Pa. 330, 341, 42 A.3d 1002, 1009 (2012) ("[T]hose litigants wishing to (continued…)

observed that such exceptions include scenarios in which an individual consents to a search during a mere encounter. *See id.* (citing *Commonwealth v. Dunnavant*, 63 A.3d 1252, 1257 n.3 (Pa. Super. 2013)). *See generally Commonwealth v. Hicks*, ___ Pa. ___, ___, 208 A.3d 916, 927 (2019) (distinguishing between a mere encounter and an investigative detention). But, during any investigative detention, the court related, a warrantless search must be supported by "a reasonable and articulable suspicion that the person seized is engaged in criminal activity[.]" *Cost*, CP-51-CR-0009310-2015, *slip op.* at 2 (quoting *Commonwealth v. Strickler*, 563 Pa. 47, 57, 757 A.2d 884, 889 (2000)); *accord Hicks*, ___ Pa. at ___, 208 A.3d at 932-33.

At the outset, the suppression court found that reasonable suspicion of criminal behavior simply was not present and reiterated that Appellant and his companions had fully cooperated with the officers. *See Cost*, CP-51-CR-0009310-2015, *slip op.* at 2. Thus, the court then proceeded to analyze whether the interaction should be characterized as a mere encounter or an investigative detention.

Along these lines, the suppression court explained that the threshold between the two forms of police-citizen interactions is assessed according to whether, considering all of the facts and circumstances surrounding the interaction, a reasonable person would have thought that he was restrained. *See id.* at 3 (citing *Commonwealth v. Moyer*, 954 A.2d 659, 664 (Pa. Super. 2008)); *accord Hicks*, ___ Pa. at ___, 208 A.3d at 927. Additionally, the court highlighted that a totality-of-the-circumstances framework governs, in that:

> [a] court must examine "all surrounding circumstances
> evidencing a show of authority or exercise of force, including

---

(…continued)
advance lines of departure, under Article I, Section 8, from Fourth Amendment doctrine, must bring the matter into sharp focus in their advocacy.").

the demeanor of the police officer, the manner of expression used by the police officer, the manner of expression used by the police in addressing the citizen, and the content of the interrogatories or statements."

*Cost*, CP-51-CR-0009310-2015, *slip op.* at 3 (quoting *Commonwealth v. Mendenhall*, 552 Pa. 484, 488, 715 A.2d 1117, 1119 (1998)).

Applying these standards, the court focused upon the following passage from the testimony of the lead officer:

> [The partner had] seen the males first. We circled. We came back around. As we came back around to conduct our investigation, the males were exiting the alleyway. Myself and [the partner] exited the vehicle as the males were coming out. I asked the males, any of you guys live back there. They're like no. I asked the males if they had ID, which all three males handed me identifications. I then asked the males, was there anything -- you guys have anything on you I need to know about? They stated no.
>
> The defendant was removing a backpack. I said, you have anything in that backpack I need to know about? At which point he stated he had a gun in the backpack.

*Id.* (quoting N.T., April 20, 2017, at 11).

Based on this evidence, the suppression court summarily reiterated "when [the officer] asked [Appellant] about what was in the bag he was carrying, there was no doubt that the stop had escalated into an investigative detention and such a question was designed to potentially incriminate [Appellant]." *Id.*; *see also id.* at 4 ("The interaction between [Appellant] and his companions and the police officers went beyond a 'mere encounter' and was in fact an 'investigative detention' wherein [Appellant] was asked an incriminating question under a coercive environment during which a reasonable person would believe he was not free to go."). Accordingly, and since the court had previously found no reasonable suspicion of criminal activity, it reaffirmed that the evidence deriving from the encounter should be excluded from trial. *See id.*

On Appellant's appeal, the Superior Court reversed in a memorandum opinion, relying extensively on *Commonwealth v. Lyles*, 626 Pa. 343, 97 A.3d 298 (2014).[5] Initially, the majority quoted *Lyles* as confirming that an *objective* examination of the totality of the circumstances is required. *See id.* at 350, 97 A.3d at 302 Further, the court reiterated:

> The totality-of-the-circumstances test is ultimately centered on whether the suspect has in some way been restrained by physical force or show of coercive authority. Under this test, no single factor controls the ultimate conclusion as to whether a seizure occurred -- to guide the inquiry, the United States Supreme Court and this Court have employed an objective test entailing a determination of whether a reasonable person would have felt free to leave or otherwise terminate the encounter. "[W]hat constitutes a restraint on liberty prompting a person to conclude that he is not free to 'leave' will vary, not only with the particular police conduct, but also with the setting in which the conduct occurs."

*Commonwealth v. Cost*, No. 1567 EDA 2017, *slip op.* at 4, 2018 WL 2773251, at *2 (Pa. Super. June 11, 2018) (quoting *Lyles*, 626 Pa. at 350-51, 97 A.3d at 302-03 (internal citations omitted)).

In terms of the retention of the identification cards, the court additionally quoted from *Lyles* as follows:

> This Court and the United States Supreme Court have repeatedly held that a seizure does not occur where officers merely approach a person in public and question the individual or request to see identification. Officers may request identification or question an individual "so long as the officers do not convey a message that compliance with their requests is required." Although police may request a

---

[5] Judge Ransom noted her dissent. *See Commonwealth v. Cost*, 1567 EDA 2017, *slip op.* at 13, 2018 WL 2773251, at *6 (Pa. Super. June 11, 2018).

person's identification, such individual still maintains "the right to ignore the police and go about his business."

*Id.* at 5, 2018 WL 2773251, at *3 (quoting *Lyles*, 626 Pa. at 351, 97 A.3d at 303 (internal citations omitted)).

The majority proceeded to discuss *Commonwealth v. Au*, 615 Pa. 330, 42 A.3d 1002 (2012), a decision in which this Court held that an officer's mere request for an identification did not escalate a mere encounter into a seizure. *See id.* at 339-41, 42 A.3d at 1008.[6] Again quoting from *Lyles*, the majority explained:

> *Au* holds that, in assessing the totality of the circumstances, a request for identification does not *in and of itself* elevate what would otherwise be a mere encounter into an investigative detention. *Au*'s limited premise is nothing new - - it merely supported and reaffirmed well-settled principles allowing officers to request identification without any level of suspicion, and hold that a request alone does not constitute an investigative detention or seizure. Notwithstanding that general principle, an encounter involving a request for identification could rise to a detention when coupled with circumstances of restraint of liberty, physical force, show of authority, conveying a demand for compliance or that there will be a tangible consequence from a refusal.
>
> That is, *Au* does not [ ] create a bright-line rule that requests for identification never contribute to a detention analysis. *Au* simply holds there is no opposite bright-line rule that such requests automatically constitute detention. Although cases involving similar or comparable seizure determinations may serve as guideposts, a suppression court must independently employ the totality-of-the-circumstances test in determining whether a seizure occurred.

---

[6] Justice Baer dissented in *Au*, joined by Justice Todd. *See Au*, 615 Pa. at 342-54, 42 A.3d at 1009-17 (Baer, J., dissenting). The dissenting position was substantially premised on the circumstances involving "six young members of society sitting in a parked car being investigated by a uniform police officer." *Id.* at 348, 42 A.3d at 1013 ("The very confines of the vehicle, coupled with [the officer's] interactions with the occupants . . . in my view distinguishes the cases cited by the Majority.").

*Cost*, 1567 EDA 2017, *slip op.* at 7, 2018 WL 2773251, at *3-4 (quoting *Lyles*, 626 Pa. at 353-54, 97 A.3d at 304-05 (emphasis and interlineation in original)).

The majority then discussed the facts of *Lyles*, in which a majority of this Court affirmed the reversal of a suppression ruling favorable to the defendant on the ground that no seizure occurred after two officers approached two men sitting on the steps of a vacant building, they asked them their reason for being there, and an officer requested and held the defendant's identification card during the interaction. *See Lyles*, 626 Pa. at 355-57, 97 A.3d at 305-07.[7]

The majority then delineated a non-exclusive list of factors relevant to determining whether an officer's encounter with a citizen rises to the level of an investigative detention, along the lines of those referenced by the suppression court. Turning to the facts of the present case, the majority stressed the non-coercive factors and concluded that:

> [t]here is no indication in the testimony presented at the suppression hearing that the officers physically restrained [Appellant] or his companions, or presented themselves in a coercive or aggressive manner that "convey[ed] a demand for compliance or [indicated] that there will be tangible consequences for a refusal." . . . The officers did not inform the men they were suspected of any criminal activity, nor does the record suggest their demeanor or tone of voice was threatening. The officer posed innocuous questions to the men while on a public street, and did not display their weapons. Accordingly, under the totality of the circumstance, we find the incident was a mere encounter.

*Id.* at 10, 2018 WL 2773251, at *5 (quoting *Lyles*, 626 Pa. at 353-54, 97 A.3d at 304).

---

[7] This author dissented in *Lyles*, joined by Justices Baer and Todd. *See Lyles*, 626 Pa. at 357-61, 97 A.3d at 307-09 (Saylor, J., dissenting). The dissent emphasized, in particular, that an officer had testified at the suppression hearing that the defendant had been stopped and stated, in objective terms, that the defendant was not free to leave while the officer was writing down information. *See id.* at 359, 97 A.3d at 308.

Next, the majority summarized Appellant's position as emphasizing that the officers had:

> (1) positioned themselves "at the mouth of the alleyway in the 'interview stance'" as they questioned the men; (2) admitted they were acting on pure speculation that there "might be something going on" in the alley; and (3) continued to question [Appellant] while they "retained control of [his] identification."

*Id.* at 10-11, 2018 WL 2773251, at *5 (quoting Brief for Appellee dated Jan. 31, 2018, in *Cost*, 1567 EDA 2017, at 8, 13, 2018 WL 1518525, at 9, 13 (Pa. Super.)). According to the majority, however, Appellant mischaracterized the evidence. First, the court stressed that the suppression court did not make a factual finding that the officers positioned themselves in a manner so as to block the alleyway or take an "interview stance" to convey their authority. *See id.* at 11, 2018 WL 2773251, at *5. The majority did accept that "there was testimony regarding this 'interview stance' during the hearing," but it opined nonetheless that the evidence "clearly was not significant to the trial court's ruling, as the court did not even mention it in its opinion." *Id.*

Additionally, the majority explained that the fact that the officers may have been acting based on speculation was irrelevant, given its view that the incident remained a mere encounter at all relevant times. *See id.*

Finally, the majority observed that Appellant "makes much of the fact that the officers continued to question him while they retained his identification, and ran a background check." *Id.* at 12, 2018 WL 2773251, at *6. In this regard, the majority observed that Appellant emphasized the following passage from *Lyles*:

> Moreover, we do not find the officer's brief recording of the card's information raised the encounter to an investigative detention. Quickly jotting down the information, as opposed to attempting to memorize did not restrain [the] appellant's freedom of movement. *The officer did not question [the]*

*appellant further while he was holding the identification, and he did not use* [*the*] *appellant's information to run a background check.* He took no additional steps that would suggest detention or restrict [the] appellant's freedom of movement. What delayed this interaction was not the officer's writing but [the] appellant's worrisome refusal to keep his hands in sight.

*Id.* (quoting *Lyles*, 626 Pa. at 356-57, 97 A.3d at 306-07 (footnote omitted)).

The majority, however, characterized this passage from *Lyles* as *dicta* and opined that it was "not controlling under the facts of the present case." *Id.* In this regard, the panel highlighted the testimony that the encounter lasted less than one minute and indicated: "[w]hile one officer checked the men's identifications, the other simply asked if they had anything on them the officers needed to know about, and if [Appellant] had anything in his backpack." *Id.* The majority then restated its position that "there was no coercive atmosphere or implied demand for compliance 'beyond the officers' mere employment.'" *Id.* at 12, 2018 WL 2773251, at *6 (quoting *Lyles*, 626 Pa. at 353-54, 97 A.3d at 304).

This Court allowed appeal on a limited basis to address:

> Did not the Superior Court panel misapply and expand this Court's decision in *Commonwealth v. Lyles*, 97 A.3d 298 (Pa. 2014), in reversing the grant of suppression by the trial court, because where two officers retain control of a person's identification in order to run a background check while continuing to question him about his possessions, the interaction is escalated from a mere encounter to an investigative detention?

*Commonwealth v. Cost*, ___ Pa. ___, 198 A.3d 1047 (2018) (*per curiam*).

Appellant maintains that retaining an identification card to conduct a background check during the course of further interrogation should weigh substantially in favor of a determination that a mere encounter has escalated into a seizure. He criticizes the Superior Court for "completely discount[ing]" these factors. Brief for Appellant at 12.

Furthermore, according to Appellant, "the panel majority employed *Lyles* as a bright-line rule in the exact manner repudiated by this Court in that very case." *Id.* at 52. It is Appellant's central position that, "[r]etention of an identification to run a background check signals to a person that officers are looking for evidence of criminal activity, and are implicitly commanding that person to remain on the scene while they do so." *Id.* at 14. In this fashion, while he maintains the Court should recognize as a "general rule" that persons in these circumstances will not reasonably feel free to terminate the encounter, *id.* at 54, Appellant stops short of advocating in favor of a *per se* approach.[8] An extensive discussion of cases from other jurisdictions is presented in Appellant's brief. *See, e.g.*, *id.* at 42-51.

With reference to the officer's questions to Appellant and his companions, Appellant explains that:

> A "need to know" request is not the same as a simple question. It implies that the officer has a right to know the answer; *i.e.* that the officer has the right to conduct a search. A common understanding of a person on the street would be that non-cooperation is not an option. When used as an adjective the phrase "need to know" means "done or given only when it is *essential* that someone *knows* something." Collins English Dictionary, online. As a verb phrase, however, it retains the connotation that what is requested is

---

[8] Significantly, Appellant repeatedly recognizes the governing totality-of-the-circumstances test, "with no single factor dictating the ultimate conclusion as to whether a seizure has occurred." Brief for Appellant at 20-21 (quoting *Commonwealth v. Livingstone*, 644 Pa. 27, 47, 174 A.3d 609, 621 (2017) (citation omitted)); *accord, e.g.*, *id.* at 21 ("The United States Supreme Court has explained its admonition that there is no 'litmus-paper test for distinguishing a consensual encounter from a seizure[.]'" (citing *Florida v. Royer*, 460 U.S. 491, 506, 103 S. Ct. 1319, 1329 (1983) (plurality))). *See generally Ohio v. Robinette*, 519 U.S. 33, 34, 117 S. Ct. 417, 419 (1996) (explaining that, in applying the totality-of-the-circumstances test, "the Court has consistently eschewed bright-line rules, instead emphasizing the fact-specific nature of the reasonableness inquiry").

"essential." Thus here the officer could be understood to have said, "I must have it."

*Id.* at 18 n.4.

Regardless of Appellant's many assertions to the contrary, the Commonwealth characterizes his effort as an attempt to establish a *per se* rule. *See* Brief for Appellee at 6-7 ("To adopt a *per se* rule that police may never ask for identification and therefore ask questions that arise from it or other circumstances of the encounter, would put form over substance, and fail to appreciate the realities of police work."). According to the Commonwealth, there is nothing in the totality of the circumstances presented that would suggest that Appellant would not have felt free to leave.

The Commonwealth also takes issue with Appellant's reliance on the asserted retention of his identification, arguing that there is no evidence of record that either of the investigating officers ever walked away from him while in possession of his identification. *See* Brief for Appellee at 4 n.2; *see also id.* at 23. Furthermore, the Commonwealth asserts:

> Although [the lead officer] testified the either he or [the detective] had 'run' [Appellant's] name over their radio system, [the suppression court] did not make a factual finding that [Appellant's] identification had been retained for purposes of running a "background check." Instead, [the suppression court's] ruling was based on [the lead officer's] asking questions.

*Id.* at 5 n.4; *see also id.* at 22.

Initially, to the degree that the Commonwealth relies on the dearth of record evidence that Appellant's license was retained while an officer went to the police vehicle and consulted with a dispatcher, we reject this position. In this regard, the burden rested upon the Commonwealth to supply the evidence justifying a warrantless search, *see Commonwealth v. Crompton*, 545 Pa. 586, 592, 682 A.2d 286, 288 (1996); *accord*

Pa.R.Crim.P. 581(H); and certainly if the officers had returned the identification cards to Appellant and his companions immediately, the prosecutor could have made that fact known. Moreover, the record of a suppression hearing is to be read in the light most favorable to the prevailing party, here, Appellant. *See, e.g.*, *Commonwealth v. Worthy*, 598 Pa. 470, 477, 957 A.2d 720, 724 (2008). Thus, while it would have been greatly preferable for the evidence to have been better developed and for the suppression court to have made closer findings concerning the range of relevant factors, the record sufficiently supports an inference that Appellant's identification was retained while an officer "ran [the] names." N.T., April 20, 2017, at 32.[9]

Turning to the broader frame, the governing principles are well settled and have been discussed, rather exhaustively, in many of this Court's decisions. *See, e.g.*, *Hicks*, ___ Pa. at ___, 208 A.3d at 924-28. As developed above, the "free-to-leave" standard presents the central inquiry of whether, considering the totality of the circumstances, the relevant police conduct would have "communicated to a reasonable person that he was not at liberty to ignore the police presence and go about his business." *Florida v. Bostick*, 501 U.S. 429, 437, 111 S. Ct. 2382, 2387 (1991) (quoting *Michigan v.*

---

[9] Similarly, to the extent that the Commonwealth is suggesting that the assertion that an officer "ran [the] names" of individuals does not signify a background check, or a review for outstanding warrants, we reject the suggestion.

Parenthetically, we note that the sparseness of the present record in material respects is not an isolated problem. *Accord State v. Martin*, 79 So.3d 951, 959 (La. 2011) ("Reviewing the totality of the circumstances here, we are confronted with the reality that the scant record leaves many questions unanswered."). In such scenarios, counsel risk that their clients' (or, in this case, the government's) interests may turn, to a substantial degree, on the initial allocation of the burden of proof and the light in which the record is reviewed on appeal based on which party has prevailed upon the initial suppression ruling.

*Chesternut*, 486 U.S. 567, 569, 108 S. Ct. 1975, 1977 (1988)); *accord Hicks*, ___ Pa. at ___, 208 A.3d at 927.[10]

Most jurisdictions agree that an officer's mere request for identification does not, by itself, transform what would otherwise be a mere encounter into an investigatory detention. *See Au*, 615 Pa. at 341, 42 A.3d at 1009; *accord, e.g., United States v. Lopez*, 443 F.3d 1280, 1285 (10th Cir. 2006) (citing *Mendenhall*, 446 U.S. at 555, 100 S. Ct. at 1877); *State v. Pollman*, 190 P.3d 234, 240 (Kan. 2008) (collecting cases). However, jurisdictions are deeply divided concerning whether, or to what degree, the retention, by an officer, of the identification documents to search for outstanding warrants escalates the encounter to a seizure. *Compare, e.g., United States v. Jordan*, 958 F.2d 1085, 1087 (D.C. Cir. 1992) ("[O]nce the identification is handed over to police and they have had a reasonable opportunity to review it, if the identification is not returned to the detainee [it is] difficult to imagine that any reasonable person would feel free to leave without it."), *with United States v. Weaver*, 282 F.3d 302, 312 (4th Cir. 2002) ("While it is without question that a driver's license is one of the most valuable pieces of personal identification possessed by any citizen, it does not logically follow that any time an officer retains someone's driver's license that such retention blossoms into an unconstitutional seizure[.]"). *See generally* Note, Aidan Taft Grano, *Casual or Coercive? Retention of Identification in Police-Citizen Encounters*, 113 COLUM. L. REV. 1283, 1296-1306 (2013) (collecting cases).

Decisions tending toward a *per se* approach "have noted the impractical and unrealistic option of a reasonable person in modern society to abandon one's

---

[10] As indicated in *Livingstone*, the reasonable person test refers to a reasonable person innocent of any crime. *See id.* at 48, 174 A.3d at 621 (citing *Commonwealth v. Jones*, 474 Pa. 364, 373, 378 A.2d 835, 840 (1977) (citation omitted)); *accord Bostick*, 501 U.S. at 438, 111 S. Ct. at 2388.

identification, as an individual is practically immobilized without adequate identification." *Martin*, 79 So.3d at 957 (citing *United States v. Lambert*, 46 F.3d 1064, 1068 (10th Cir. 1995), *Jordan*, 958 F.2d at 1087, and *State v. Daniel*, 12 S.W.3d 420, 427 (Tenn. 2000)); *see also U.S. v. Washington*, 992 F. Supp. 2d 789, 793 (N.D. Ohio 2014) (characterizing an officer's retention of a driver's license as a "virtual leash"). Determinations in the opposing camp tend to stress the tolerance accorded by the Supreme Court of the United States for pressures inherent in police-citizen encounters and conclude that a brief retention of an identification card does not, in and of itself, alter the nature of an otherwise voluntary encounter. *See Martin*, 79 So.3d at 958, 960; *accord Weaver*, 282 F.3d at 310-13.

As noted, this case does not call for us to consider the adoption of a bright-line rule. *See supra* note 8. We do agree with Appellant, however, that the retention by police of an identification card to conduct a warrant check will generally be a material and substantial escalating factor within the totality assessment. In this regard, our sentiments tend toward the following analysis by the District of Columbia Court of Appeals:

> [A]n officer's decision to run a check for outstanding warrants can be a pivotal event in [an otherwise consensual street] encounter; it sends a strong signal to a reasonable person that the officer will not allow him to leave while the inquiry is in progress precisely because the outcome of the inquiry may necessitate the person's detention. The trial judge discounted the importance of the warrant check in this case because it did not prolong [the] appellant's encounter with police, but that misses its true significance. However long the warrant check took, while it was under way it conveyed a message that [the] appellant's liberty was being restrained. The critical point here is that the warrant check was still under way, its results not yet known, when [the investigating officer] asked for [the] appellant's [personal effect].

*Jones v. U.S.*, 154 A.3d 591, 597 (D.C. 2017).[11]

Coupled with other relevant factors in the case, we conclude that the officer's or his partner's retention of Appellant's identification card to conduct a warrant check -- as he was asked if there was anything in his backpack that the officer needed to know about -- was sufficient to signify to a reasonable person that he was not free to proceed about his business. *Accord Pollman*, 190 P.3d at 240 ("[I]f a law enforcement officer retains a driver's license, this can be a factor considered in the totality of the circumstances and may, *absent offsetting circumstances*, mean a reasonable person would not feel free to leave without his or her license." (emphasis added)). The announcement of "police," while perfectly understandable, was an initial escalating factor. Albeit that the testimony on the point is quite scant, viewing the record in the light most favorable to Appellant, it can be concluded that the officers (also quite rationally) adopted a stance that would convey to a reasonable person that such person is perceived as a potential threat. Additionally, we agree with Appellant that repeated queries whether there is anything that a police officer "need[s] to know" about within a person's possessions suggests some authoritative right to know about the contents.

It is also significant, in our judgment, that there is no evidence that the officer ever explained to Appellant what he intended to do with the identification card. Rather, from all appearances, once Appellant gave it to the officer, the officer simply proceeded

---

[11] We express a modest degree of circumspection here concerning only the degree of coerciveness involved, since, under Fourth Amendment jurisprudence, the relevant perspective is from that of a reasonable *innocent* person, *see supra* note 10, and presumably such a person would know that he has no outstanding warrants. Nevertheless, the person would also be aware that the officer has no way of knowing this prior to the warrant check, and as a consequence, he would likely conclude that departure while the check was in progress would be problematic.

to do with it as he wished. Again, such treatment of another's property is a substantial escalating factor in terms of the assertion of authority.[12]

As to the brief time during which the evidence suggests that an officer retained Appellant's identification card, the relevant decisional law has made clear that citizens "may not be detained *even momentarily* without reasonable, objective grounds for doing so." *Royer*, 460 U.S. at 498, 103 S. Ct. at 1324 (emphasis added).[13] Accordingly, the most important factor, relative to timing, is that the record -- read most favorably to Appellant -- adequately supports an inference that an officer continued to hold Appellant's identification card at the time of the questioning. *Accord Jones*, 154 A.3d at 597.[14]

Finally, both Appellant and the Commonwealth offer policy arguments in support of their respective positions. Were this Court in a position of a policymaker relative to Fourth Amendment law, we might perhaps come to a different reconciliation of the competing interests and application of the overarching principles. *Cf. Au*, 615 Pa. at

---

[12] Certainly, the Commonwealth is correct that there are a number of factors present in this case that would not escalate the interaction beyond a mere encounter. To the degree that those factors represent manifestations of the officers' authority, however, they nevertheless retain relevance. *Accord Jones*, 154 A.3d at 595-96.

[13] Although *Royer* was a plurality decision, this point is widely affirmed by federal and state courts.

[14] Given the fact-specific nature of these cases, we do not find it useful to return to *Lyles* for comparison. Notably, the difference between the majority and the dissent there centered on particularized testimony by the investigating officer that he had, in fact, stopped the defendant and that the defendant was not free to leave during the interaction. *See supra* note 7. Neither of those circumstances is present here.

Nevertheless, we do credit Appellant's argument that the *Lyles* Court itself suggested that retention of an identification card to conduct a warrant check would be an escalating factor. *See Lyles*, 626 Pa. at 356-57, 97 A.3d at 306-07.

338-39, 42 A.3d at 1007-08 (recognizing conceptual difficulties inherent in the free-to-leave standard as interpreted by the Supreme Court of the United States); *Golphin v. State*, 945 So.2d 1174, 1190 (Fla. 2006) ("In interpreting the scope of the Fourth Amendment, courts appear to have steadily increased expectations that the 'reasonable person' is one who not only knows the full extent of his rights, but zealously protects them to the point that he will not hesitate to confront authority and demand the return of identification so that he may effect his right to walk away."). Instead, as in *Au*, we are simply applying a standard devised and enforced by the Supreme Court of the United States, which is the final interpreter of the United States Constitution. While we realize that there are solemn consequences of these applications in terms of both the maintenance of individual liberties and the vindication of important law enforcement concerns, our obligation in this arena is simply to do our best to adhere to the federal mandates. *Accord Au*, 615 Pa. at 338-41, 42 A.3d at 1007-09.

Although the question of whether Appellant was subject to an investigative detention at the relevant time is a close one under governing Fourth Amendment law, *accord Jones*, 154 A.3d at 598, we hold, as found by the suppression court, that he was indeed seized.

The order of the Superior Court is reversed.


Justices Baer, Todd and Dougherty join the opinion.

Justice Wecht files a concurring opinion in which Justice Donohue joins.

Justice Mundy files a dissenting opinion.